[Civil No. 2715.   Filed December 17, 1928.]

[272 Pac. 923.]

# THE CITY OF TUCSON, Appellant, v. ARIZONA MORTUARY, a Corporation, Appellee.

496

498

Mr. Ben C. Hill, City Attorney, for Appellant.

Messrs. Campbell & Conner, for Appellee.

LOCKWOOD, J.—Arizona Mortuary, a corporation, hereinafter called plaintiff, brought suit against the City of Tucson, a municipal corporation, hereinafter called defendant, to enjoin the latter from enforcing the provisions of Ordinance 600 of the City of Tucson, which regulates the location of mortuaries. The trial court granted the injunction, and from the decision of that court this appeal has been taken.

The facts of the case are as follows: On the twelfth day of May, 1926, there was no ordinance in the City of Tucson regulating the location of mortuaries. All existing establishments of that nature were and had been for many years located in what is unquestionably the business district of the City, and within the limits of the mortuary district thereafter established by ordinance 600. About the date mentioned plaintiff purchased for the price of five thousand dollars a certain lot on the northeast corner of Stone Avenue and Third Street, applied for and received from the building inspector of Tucson a permit authorizing it to construct on said lot a mortuary building, entered into a contract for its erection, the estimated

cost being in the neighborhood of twenty-five thousand dollars, and actually commenced work thereon. As soon as it became generally known that the mortuary was to be established, some fifty property owners in the vicinity thereof requested the mayor and common council to pass an ordinance regulating the location of the undertaking business, which would prevent plaintiff from using the site above referred to for that purpose. This petition was first presented to the council on May 21st, and the matter was discussed by the interested parties and referred to the city attorney for the purpose of investigation as to the law. While this investigation was under way plaintiff applied to the city license collector for a license to conduct an undertaking business at the location described, although the building was not then ready for use, and would not be for some months, and paid a license tax for the remainder of the current year in advance, although under the ordinances of Tucson such taxes are only payable quarterly, and proceeded with the construction of the mortuary. On the sixth day of July, Ordinance 600 was finally passed. At that time a number of the citizens who had previously protested against the location of the mortuary withdrew their objections, though the majority did not. The ordinance was adopted in the manner we shall hereafter describe, and thereafter this suit was commenced to enjoin its enforcement.

There are some thirty assignments of error, but we shall discuss them under four heads. The first is the general right of municipalities to regulate mortuaries; the second, the nature of the regulations permissible; the third, whether the ordinance in question goes beyond the permissible limits; and, the fourth, whether it was adopted as provided by law. It is generally conceded that mortuaries, to use the modern term applied to undertaking and embalming establishments,

are subject to reasonable police regulation as to their location as well as to the manner in which they are conducted. The Supreme Court of Minnesota, in the case of *Meagher et al.* v. *Kessler*, 147 Minn. 182, 179 N. W. 732, says:

"It has been held, in a number of well considered cases, that undertaking and embalming establishments may be deemed nuisances, depending largely on the locality in which they are conducted. . . .

"The general principles involved in these cases fully justify the conclusions arrived at by the learned trial court in the case at bar. The feelings and sentiments of the respondents are those of the ordinary, normal individual living under similar conditions, that is, being compelled, by day and night, to look out from their homes upon an institution devoted solely to the carrying in and out of dead bodies, and the conducting of obsequies. It is the almost universal rule that an undertaking business is not a nuisance *per se,* but, as generally held, the ordinary person can hardly live next door to such an establishment without becoming depressed and more or less deprived of the comforts and enjoyment of his surroundings and when long continued it is liable to affect his general health.

"We conclude that the rule must be considered as well settled, and when the prosecution of a business, of itself lawful, in a strictly residential district, impairs the enjoyment of homes in the neighborhood, and infringes upon the well being and comfort of the ordinary, normal individual residing therein, the carrying on of such business, in such locality, becomes a nuisance and may be enjoined. There is no fixed or arbitrary rule, however, governing cases of this kind. Each must be determined by the particular facts and circumstances therein."

To the same general effect are the cases of: *Goodrich* v. *Starrett*, 108 Wash. 437, 184 Pac. 220; *Osborn* v. *Shreveport*, 143 La. 932, 3 A. L. R. 955, 79 South. 542; *Spencer-Sturla Co.* v. *Memphis*, 155 Tenn. 70, 290 S. W. 608; *Brown* v. *Los Angeles*, 183 Cal. 783,

192 Pac. 716; *Odd Fellows' Cemetery Assn.* v. *San Francisco*, 140 Cal. 226, 73 Pac. 987; *Laurel Hill Cemetery Assn.* v. *San Francisco*, 152 Cal. 464, 14 Ann. Cas. 1080, 27 L. R. A. (N. S.) 260, 93 Pac. 70.

The second question is, what limit is there to the regulating power of a municipality, or, in other words, what would be considered reasonable? So far as the operation of the business itself is concerned, it will doubtless be conceded that the municipality could pass any reasonable ordinance compelling the proprietors of such establishments to conduct them in as sanitary and inoffensive a manner as possible without defeating the obviously necessary purpose of their maintenance. The particular question is as to the reasonableness of limiting the places where they may be maintained.

The leading case in the United States on the general regulation of the location of business establishments is undoubtedly that of *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 54 A. L. R. 1016, 71 L. Ed. 303, 47 Sup. Ct. Rep. 114. In that case the village of Euclid had attempted to regulate the location of practically all classes of business within its limits by what is known as a "general zoning ordinance." The entire village was divided into some six classes of "use" districts, and these districts were classified rigidly in respect to the use to which buildings erected therein could be put. The Supreme Court of the United States, in discussing the constitutionality of such an ordinance, said:

"Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years, urban life was comparatively simple; but with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban

communities. Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not to the *meaning*, but to the *application* of constitutional principles, statutes and ordinances, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall.

"The ordinance now under review, and all similar laws and regulations, must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions. A regulatory zoning ordinance, which would be clearly valid as applied to the great cities, might be clearly invalid as applied to rural communities. In solving doubts, the maxim '*sic utere tuo ut alienum non laedas*,' which lies at the foundation of so much of the common law of nuisances, ordinarily will furnish a fairly helpful clew. And the law of nuisances, likewise, may be consulted, not for the purpose of controlling, but for the helpful aid of its analogies, in the process of ascertaining the scope of, the power. Thus the question whether the power exists to forbid the erection of a building of a particular kind or for a particular use, like the question whether a particular thing is a nuisance, is to be determined, not by an abstract consideration of the building or of the thing considered

apart, but by considering it in connection with the circumstances and the locality. *Sturges* v. *Bridgman,* L. R. 11 Ch. Div. 852, 865. A nuisance may be merely a right thing in the wrong place—like a pig in the parlor instead of the barnyard. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control. *Radice* v. *New York,* 264 U. S. 292, 294, 68 L. Ed. 690, 694, 44 Sup. Ct. Rep. 325.''

We think the principles above set forth are accepted as being the best general exposition of the police power on the subject of the regulation of business by zoning yet made. The court found on the facts of the case as follows:

''The record goes no farther than to show, as the lower court found, that the normal and reasonably to be expected, use and development of that part of appellee's land adjoining Euclid avenue is for general trade and commercial purposes, particularly retail stores and like establishments, and that the normal, and reasonably to be expected, use and development of the residue of the land is for industrial and trade purposes.''

It was contended, among other things, in the case cited that the ordinance was unreasonable, for the following reasons:

''It is said that the village of Euclid is a mere suburb of the City of Cleveland; that the industrial development of that city has now reached and in some degree extended into the village and, in the obvious course of things, will soon absorb the entire area for industrial enterprises; that the effect of the ordinance is to divert this natural development elsewhere with the consequent loss of increased values to the owners of the lands within the village borders.''

Answering this, the court said:

''But the village, though physically a suburb of Cleveland, is politically a separate municipality, with powers of its own and authority to govern itself as it

sees fit within the limits of the organic law of its creation and the state and Federal Constitutions. Its governing authorities, presumably representing a majority of its inhabitants and voicing their will, have determined, not that industrial development shall cease at its boundaries, but that the course of such development shall proceed within definitely fixed lines. If it be a proper exercise of the police power to relegate industrial establishments to localities separated from residential sections, it is not easy to find a sufficient reason for denying the power because the effect of its exercise is to divert an industrial flow from the course which it would follow, to the injury of the residential public if left alone, to another course where such injury will be obviated. It is not meant by this, however, to exclude the possibility of cases where the general public interest would so far outweigh the interest of the municipality that the municipality would not be allowed to stand in the way.

"We find no difficulty in sustaining restrictions of the kind thus far reviewed. The serious question in the case arises over the provisions of the ordinance excluding from residential districts, apartment houses, business houses, retail stores and shops, and other like establishments. This question involves the validity of what is really the crux of the more recent zoning legislation, namely, the creation and maintenance of residential districts, from which business and trade of every sort, including hotels and apartment houses, are excluded. Upon that question this court has not thus far spoken. The decisions of the state courts are numerous and conflicting; but those which broadly sustain the power greatly outnumber those which deny altogether or narrowly limit it; and it is very apparent that there is a constantly increasing tendency in the direction of the broader view. We shall not attempt to review these decisions at length, but content ourselves with citing a few as illustrative of all." (Citing cases.)

We give these quotations somewhat at length, because they are peculiarly applicable to the findings of the trial court and the contentions of plaintiff herein.

Quoting from the Supreme Court of Illinois in *Aurora* v. *Burns*, 319 Ill. 93, 149 N. E. 784, 788, the court continues:

"The constantly increasing density of our urban populations, the multiplying forms of industry and the growing complexity of our civilization make it necessary for the state, either directly or through some public agency by its sanction, to limit individual activities to a greater extent than formerly. With the growth and development of the state the police power necessarily develops, within reasonable bounds, to meet the changing conditions. . . .

" ' . . . The harmless may sometimes be brought within the regulation or prohibition in order to abate or destroy the harmful. The segregation of industries, commercial pursuits and dwellings to particular districts in a city, when exercised reasonably, may bear a rational relation to the health, morals, safety and general welfare of the community. The establishment of such districts or zones may, among other things, prevent congestion of population, secure quiet residence districts, expedite local transportation, and facilitate the suppression of disorder, the extinguishment of fires and the enforcement of traffic and sanitary regulations. The danger of fire and the risk of contagion are often lessened by the exclusion of stores and factories from areas devoted to residences, and, in consequence, the safety and health of the community may be promoted. . . .

" ' . . . The exclusion of places of business from residential districts is not a declaration that such places are nuisances or that they are to be suppressed as such, but it is a part of the general plan by which the city's territory is allotted to different uses in order to prevent, or at least to reduce, the congestion, disorder and dangers which often inhere in unregulated municipal development.' "

And, in finally disposing of the case, the court said as follows:

"The relief sought here is of the same character, namely, an injunction against the enforcement of any of the restrictions, limitations or conditions of the

ordinance. And the gravamen of the complaint is that a portion of the land of the appellee cannot be sold for certain enumerated uses because of the general and broad restraints of the ordinance. What would be the effect of a restraint imposed by one or more of the innumerable provisions of the ordinance, considered apart, upon the value or marketability of the lands is neither disclosed by the bill nor by the evidence, and we are afforded no basis, apart from mere speculation, upon which to rest a conclusion that it or they would have any appreciable effect upon those matters. Under these circumstances, therefore, it is enough for us to determine, as we do, that the ordinance in its general scope and dominant features, so far as its provisions are here involved, is a valid exercise of authority, leaving other provisions to be dealt with as cases arise directly involving them.

''And this is in accordance with the traditional policy of this court. In the realm of constitutional law, especially, this court has perceived the embarrassment which is likely to result from an attempt to formulate rules or decide questions beyond the necessities of the immediate issue. It has preferred to follow the method of a gradual approach to the general by a systematically guarded application and extension of constitutional principles to particular cases as they arise, rather than by out of hand attempts to establish general rules to which future cases must be fitted. This process applies with peculiar force to the solution of questions arising under the due process clause of the Constitution as applied to the exercise of the flexible powers of police, with which we are here concerned.''

See, also, *Zahn* v. *Board of Public Works,* 274 U. S. 325, 71 L. Ed. 1074, 47 Sup. Ct. Rep. 594; *Gorieb* v. *Fox,* 274 U. S. 603, 53 A. L. R. 1210, 71 L. Ed. 1228, 47 Sup. Ct. Rep. 675; *Nectow* v. *Cambridge,* 277 U. S. 183, 72 L. Ed. 842, 48 Sup. Ct. Rep. 447.

It therefore appears that the highest authority in the land has held that ordinances dividing cities into districts on the basis of whether they are residential or business and limiting the use of real estate within

these various districts to certain purposes are to be sustained in principle, it being necessary in order that they be declared unconstitutional that it affirmatively appear the restriction is clearly arbitrary and unreasonable, and has not any substantial relation to the public health, safety, morals or general welfare. With this principle before us as the guiding star, let us next consider the reasonableness of the particular ordinance in question.

Under its terms, mortuary establishments in the city of Tucson are limited to a certain district set forth in the ordinance, which comprises some five per cent of the total area of the City of Tucson, within which district ninety-five per cent of the buildings are used for business purposes; the available business frontage in said district being some eighty-five thousand linear feet, of which something less than six hundred is now occupied by mortuaries while in the excluded district in which plaintiff's establishment is proposed to be located, ninety-eight per cent of the buildings are used for residences. On these facts it would certainly appear that the prohibited area as a whole is most emphatically a residence district. The court found, however, in addition, that the immediate vicinity of plaintiff's establishment was not strictly a residential district, but was mixed and rapidly giving way to business, and that it was a very suitable and convenient place for a mortuary. It is obvious that it would be extremely difficult, if not impossible, to find any considerable district in a growing city which was one hundred per cent either business or residential. Even in the business district of Tucson there are doubtless a few isolated residences surviving. Even in the most exclusively aristocratic residence districts of the various cities of our country there are frequently found a few neighborhood corner groceries, drug-stores and filling stations. The line must be drawn somewhere.

To hold that for zoning purposes a district could not be classified as residential merely because a few isolated business houses had been already established therein would practically prohibit the exercise of the right of zoning. As we have seen by the foregoing quotations from the Euclid case, neither the mere fact that the natural development of a district was toward industrial enterprise and that the normal and reasonably to be expected future use of certain property was for industry and trade purposes, nor the fact that property, if used for business purposes, would be of more value than if used for residential, will justify a court in finding unconstitutional an ordinance which checks or defeats such development or diverts it to another district.

It is the rule in all cases involving the validity of the exercise of the police power that courts will interfere with the action of the legislative authority only when it is plain and palpable that the ordinance has no real or substantial relation to the general welfare, and that it is unreasonable, arbitrary, and discriminatory. *Radice* v. *New York, supra; Euclid* v. *Ambler Realty Co., supra; Thomas Cusack* v. *Chicago,* 242 U. S. 526, Ann. Cas. 1917C 594, L. R. A. 1918A 136, 61 L. Ed. 472, 37 Sup. Ct. Rep. 190. We are of the opinion that it does not appear affirmatively the ordinance in question was so unreasonable, arbitrary, and discriminatory that it would have been unconstitutional if it had been adopted before plaintiff had commenced the erection of its building.

It is urged, however, that since plaintiff had purchased the property in question, had received a permit to construct a mortuary there from the city, and had paid its license for conducting such a business at that location, the defendant was estopped from prohibiting it from proceeding to maintain its business. And in support of such contention the case of *Dobbins*

v. *Los Angeles,* 195. U. S. 223, 49 L. Ed. 169, 25 Sup. Ct. Rep. 18, is cited. The facts in that case were that plaintiff, Dobbins, had commenced the erection of a gas works in a district where such structures were at the time permitted by the express terms of the ordinance and had received a permit from the city so to do. Shortly thereafter the limits were narrowed, leaving plaintiff's property without the district where gas plants were allowed, and she asked for an injunction against the enforcement of the new ordinance. In her complaint she alleged, among other things, that the true purpose of the ordinance was not police regulation in the interest of the public, but the destruction of her rights and the building up of another company within the narrower privileged district. The City demurred to the complaint, and the demurrer was sustained. The Supreme Court of the United States, in discussing the case, held that the mere fact a certain business is in existence does not of itself give it a vested right against the exercise of the police power, stating:

"The prosecution of the business, originally harmless, may become, by reason of the manner of its prosecution, or a changed condition of the community, a menace to the public health and safety. In other words, the right to exercise the police power is a continuing one, and a business lawful today may in the future, because of the changed situation, the growth of population or other causes, become a menace to the public health and welfare, and be required to yield to the public good."

In considering the allegations of the complaint in regard to the sudden and unexplained change of the law, it held, however, that the demurrer should have been overruled, and the City put on its answer, presumably as to the allegation that the ordinance was not meant for the general welfare, but to favor a special competitor. With this holding of the court we

heartily agree. If it is alleged and proved that the real purpose of passing an ordinance was an arbitrary and unjust discrimination, it of course cannot stand. But such was not the situation in the case at bar. Up to the time plaintiff purchased its property all mortuaries in the City of Tucson had been conducted in the strictly business district. There had been no attempt on the part of any one of them to enter the residential section, and no ordinance of any kind regulating the location of mortuaries had been considered necessary. As soon as it was known what plaintiff intended to do, a protest was filed; the city council notified plaintiff of that fact, and immediately began consideration of the question of regulating the location of mortuaries, adopting the ordinance in question soon after. Such facts are very far, indeed, from those alleged in the complaint in the Dobbins case, and which the Supreme Court of the United States said required an answer. Counsel for plaintiff argue with much zeal that the meaning of the Dobbins case is that unless there is an actual change in the existing conditions a business once permitted as lawful cannot be excluded, and that no such change had occurred in the present case. We think plaintiff has given the language of that case a meaning and application not contemplated by the court which rendered the opinion. If plaintiff's business had been an established, long-continuing one, acquiesced in with full knowledge of the facts by the city authorities, or if mortuaries had been permitted at the location in question on May 12th by express ordinance, and not merely because the city had not as yet found it necessary to act at all on the subject, the situation would have been very different, and an estoppel might be entitled to consideration. But such was not the case. Up to May 12th, so far as the record shows, it had never occurred to anyone that there would be an attempt to establish a mortuary outside the recognized

business district. As soon as the attempt was known, proceedings were immediately initiated and carried forward to establish the restricted district. To hold that under circumstances like this the city was estopped would mean that the governing authorities of municipalities, unless they foresaw in advance every condition which might arise and acted before the contingency occurred, would be helpless thereafter to meet the changed situation. We are satisfied that the situation changed within the true meaning of the Dobbins case as soon as plaintiff attempted to locate its mortuary where it did, and that the municipal authorities acted with reasonable promptness under the circumstances.

It is also contended that plaintiff had vested rights which were entitled to protection. Although it had purchased the land in question and let the contract for the building before the ordinance was adopted, yet before any material amount of construction had actually been done, it was fully advised that the ordinance was under contemplation. Instead of awaiting the action of the council, it apparently proceeded on the theory either that the ordinance would not be passed, or that, if passed, it was void. Having taken that chance, it may not now be heard to set up any loss to it which arose from its actions *after* it had knowledge that the ordinance was being considered. But even if plaintiff suffered some damages through things occurring *before* the protest, financial loss, no matter how severe, does not of itself give parties a vested right to continue a business, no matter how long it has been conducted, if the business is one whose location may be regulated under the police power. In the case of *Hadacheck v. Sebastian,* 239 U. S. 394, Ann. Cas. 1917B 927, 60 L. Ed. 348, 36 Sup. Ct. Rep. 143, it appeared that plaintiff had long been engaged in the manufacture of bricks in a certain location in Los Angeles, and that his property for that purpose was

worth some eight hundred thousand dollars. Later the City passed a zoning ordinance which prohibited the use of the property for brickmaking, and in effect lowered its value to less than one hundred thousand dollars. The court, however, held that his vested interest could not be asserted against the police power, stating:

"It is to be remembered that we are dealing with one of the most essential powers of government,—one that is the least limitable. It may, indeed, seem harsh in its exercise, usually is on some individual, but the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily. *A vested interest cannot be asserted against it because of conditions once obtaining. Chicago & A. R. Co. v. Tranbarger, 238 U. S. 67, 78, 59 L. Ed. 1204, 1211, 35 Sup. Ct. Rep. 678.* To so hold would preclude development and fix a city forever in its primitive conditions. There must be progress, and if in its march private interests are in the way, they must yield to the good of the community. The logical result of petitioner's contention would seem to be that a city could not be formed or enlarged against the resistance of an occupant of the ground, and that if it grows at all it can only grow as the environment of the occupations that are usually banished to the purlieus." (Italics ours.) *Atlantic Coast Line R. Co. v. Goldboro,* 232 U. S. 548, 58 L. Ed. 721, and cases cited, 34 Sup. Ct. Rep. 364.

It is of course true that in determining whether the general welfare requires interference with property rights by a zoning ordinance, municipalities should, and presumably generally do, consider, among other things, the loss to property owners by a restriction of the use of their property. This, however, is only one of the considerations on which the final decision is to be based. Doubtless, if the value of the property rights destroyed is so great, as compared with the benefit done, that it clearly appears the ordinance is arbitrary and unreasonable, the courts will inter-

fere, but if there can be any reasonable argument on the question the legislative will must prevail.

In the case at bar any loss for money expended *after* plaintiff had notice of the proposed ordinance was at its peril, and cannot be considered as a vested right, entitled to any consideration. If the ordinance be valid, the contractor would have no action against plaintiff for failing to complete its contract, though he would have one on *quantum meruit* for what was already done. The only loss which could be considered would be the decreased value of the lot, if any, because it could not be used for a mortuary, and the few dollars expended on the property before the plaintiff had notice of the protest. Since a vested right does not *ipso facto* defeat an ordinance of this kind, we cannot say affirmatively that Ordinance 600 of the City of Tucson was on its face and on the facts found by the trial court inherently so unreasonable and discriminatory that it is unconstitutional. We therefore hold that if it was adopted in the manner provided by law it is constitutional. Was it so adopted?

It was stipulated at the trial that the ordinance was passed in the following manner:

"That John E. White is now, and at all times since, on or about January 1st, 1925, has been the duly elected, qualified and acting Mayor of the City of Tucson; that on the 6th day of July, 1926, a regular meeting of the City Council of the City of Tucson was held; that the said John E. White, Mayor of Tucson, was not present at said meeting, he being at that time absent from the City of Tucson; that at said meeting there were present all of the members of the City Council of the City of Tucson, being six in number; that at said meeting of July 6th, 1926, upon motion of Councilman Chambers, duly made, seconded and unanimously carried, Councilman J. F. Pfeiffer was elected president *pro tem.* to preside at the meeting in the absence of the Mayor. That no other action of any kind was taken by the City Council of the

City of Tucson for the purpose of qualifying any person to discharge the duties of the Mayor during his absence from the City. That at said meeting of July 6th, 1926, the following action was taken, as shown by the minutes of said meeting:

" 'Councilman Jaastad stated that the Building and Land Committee was ready to report upon the matter of the regulation of funeral parlors, and called upon the City Attorney to read the Ordinance which they had instructed him to prepare, and thereupon Ordinance No. 600, regulating undertaking or embalming business, or mortuaries, was read the first time in full, and upon motion of Councilman Jaastad, duly made, seconded and carried, read the second and third time by title only, and placed on its final passage. The roll call resulted as follows: Chambers, Cordis, Holbert, Jaastad, Pfeiffer and Pilcher, Aye, and Ordinance No. 600 was declared duly passed and adopted.'

"That the minutes of said meeting of July 6th, 1926, were signed as follows: 'J. F. Pfeiffer, President *pro tem.*' That during the course of said meeting of July 6th, 1926, and immediately after the passage of said Ordinance, said Ordinance No. 600 was signed by the said J. F. Pfeiffer as follows: 'Approved this 6th day of July, J. F. Pfeiffer, President *pro tem.*' That said ordinance No. 600 was at no time submitted to the said John E. White for his approval or disapproval. That the said John E. White had returned to and was in the City of Tucson and discharging the duties of his office as Mayor of said City on the 13th day of July, 1926, and attended a meeting of the Common Council of the City of Tucson held July 13th, 1926. That said Ordinance No. 600 was not at any time subsequent to July 6th, 1926, repassed by the Common Council of the City of Tucson."

It is the contention of plaintiff that the ordinance was invalid on the foregoing facts, as not having been approved by the mayor or passed over his veto. The manner of the adoption of ordinances of municipalities is regulated either by their charters or by

general statute. The City of Tucson as at the time in question was acting under a special charter originally adopted in 1883. This charter, so far as it relates to the method of passage and approval of ordinances, reads as follows:

"Section 1. The Mayor and Common Council shall hold their regular meetings on the first Monday in each month. A majority of all the members elected shall be a quorum; and a less number may adjourn from time to time and may compel the attendance of absent members. The Mayor shall preside at all meetings of the Common Council, but shall be entitled to no vote unless in case of a tie. In the absence of the Mayor at any regular, or adjourned, or called meeting of the Common Council, if four members are present they may choose one of their own number to preside at such meeting, and all acts of such presiding officer shall have the same validity as if done by the Mayor; and such Mayor *pro tempore* shall not thereby lose his vote as Councilman. Every order made and ordinance passed by the Mayor and Common Council, in order to have legal force, must receive not less than four votes and the approval of the Mayor; or if he fail or refuse to approve the same within ten days after its passage, to render such order or ordinance valid, it must receive the votes of five of the Councilmen."

It appears therefrom that in the absence of the mayor at any meeting four members of the council may choose one of their own number to preside at such meeting, and "all acts of such presiding officer shall have the same validity as if done by the mayor." If, therefore, the mayor may approve an ordinance adopted at such meeting immediately upon its adoption and during the meeting, and his approval be valid, it would seem there can be no question that such action on the part of the mayor *pro tempore* would be equally valid. Plaintiff argues, however, that such is not the spirit of the charter; that it was meant the presiding officer should only exercise the

ordinary procedural duties of the mayor as presiding officer over the meetings of the council, to the exclusion of his independent duties as mayor of the City, such as approving ordinances, making appointments, etc. It claims that the subsequent provision of the section, "or if he fail or refuse to approve the same within ten days after its passage, to render such order or ordinance valid, it must receive the votes of five of the councilmen" means that the mayor has ten full days' time to consider an ordinance, and that any action thereon by the president *pro tempore* before the expiration of the ten days is unauthorized.

We cannot concur in this view. If plaintiff's position be correct, when, if at all, may a mayor *pro tempore* approve an ordinance? By the process of elimination, since the mayor has every minute of the ten days in which to consider his action, the former could not act at all. In other words, although the charter gives him all the powers of the mayor during the meeting, neverthless he could never exercise one of the most important, that of approving or disapproving ordinances. The general rule of law unquestionably is that a mayor *pro tempore*, made such by the charter, has all the powers of the mayor himself during the period in which he may act, unless some special exception appear in the charter. McQuillin, Municipal Ordinances, par. 691; *O'Mally* v. *McGinn,* 53 Wis. 353, 10 N. W. 515; *Barton* v. *Recorder's Court,* 60 Or. 273, 119 Pac. 349; *Hunter* v. *Louisville,* 208 Ky. 562, 271 S. W. 690; *Seattle* v. *Doran,* 5 Wash. 482, 32 Pac. 105, 1002. Counsel for plaintiff has cited us to a number of cases holding to the contrary. In most, if not all of these, it appears that the acting mayor in what he did proceeded against the protest of the mayor. The old adage is that "hard cases make poor law" and the reasoning of the cases last referred to seems to follow that adage. We are of the opinion that on the stipulation filed, since considera-

tion for ten days before acting was permissive and not mandatory, the mayor would have had the right to approve the ordinance immediately after its passage and at the meeting when it was passed, and therefore it was within the power of the mayor *pro tempore* to approve it then, and his approval had the same effect as would that of the actual mayor.

Counsel urges upon us that the final decision in this case will be a precedent and that its reasoning will be as applicable to a case of the absence of a Governor as to the absence of a mayor. We agree with this statement. This court has recently had before it a very similar situation. Under our Constitution the Secretary of State, when the Governor is absent from the state, has all the powers and duties of the latter. During the temporary absence of the Governor on public business the Secretary of State made an appointment to one of the most important offices under the control of the Governor. Immediately upon learning of this apointment the Governor publicly repudiated such action, and bitterly criticised the Secretary of State for his conduct. The validity of the appointment was litigated in this court, and was passed on in the case of *McCluskey* v. *Hunter,* 33 Ariz. 513, 266 Pac. 18, wherein we affirmed its validity. In that case we said:

"It might be well to say here that under section 6, article 5, of the Constitution of Arizona, the powers and duties of the Governor, when that officer is absent from the state, devolve upon the Secretary of State and his acts at such times, whatever they may be, are just as valid and binding as though they had been performed by the Governor himself. Hence, if a condition existed in Arizona on January 20, 1928, that gave the chief executive of the state the right to appoint a member of the Industrial Commission there can be no question but that the acting Governor could have exercised this right just as effectively as could the Governor himself had he been within the

state. Whether, however, it was good policy under the circumstances for him to do so or in keeping with the proprieties which an acting Governor might be supposed to observe is a matter which cannot be considered by the court.''

Even were the mayor *pro tempore* not authorized to approve the ordinance as he did, there is another reason why it was valid. The charter provisions above quoted do not provide for the ordinary veto, by returning the ordinance to the council with the mayor's disapproval, nor do they set forth any method of passing an ordinance over a veto. They simply say that an ordinance, to have legal force, ''must receive not less than four votes and the approval of the mayor or if he fail or refuse to approve the same within ten days after its passage, to render such order or ordinance valid it must receive the votes of five of the Councilmen.'' We are of the opinion that in the absence of any special provision requiring such action an ordinance, after the mayor has failed to approve it, need not be returned for reconsideration or repassage if it has received the votes of five of the members of the council on its original passage. In such case it is valid without any further action, regardless of whether or not the mayor has approved. *Rhodes* v. *People,* 67 Colo. 4, 185 Pac. 264.

For both the foregoing reasons we hold that the ordinance was adopted in manner and form as provided by the charter of the City of Tucson, and, since it does not affirmatively appear it is unconstitutional, it is valid. The order of the superior court granting an injunction is reversed and the case remanded, with instructions to deny the injunction, and for such proceedings as may be proper.

ROSS, C. J., and McALISTER, J., concur.