STATE OF FLORIDA, ex rel. JOHN J. SKILLMAN, *Plaintiff in Error*, v. CITY OF MIAMI, a municipal corporation, and GUY C. REEVE, Chief of Police of the City of Miami, Florida, *Defendant in Error*.

Division  A.
Opinion filed May 12, 1931.

*Semple & Hirschman, T. E. Price* and *Harold Kasse-w45*, for Plaintiff in Error;

*J. W. Watson, Jr.,* and *Loftin, Stokes & Calkins,* for Defendant in Error.

BUFORD, C.J.—On December 2nd, 1930, the City Commission of the City of Miami, Florida, adopted Ordinance No. 950. Section 1 of said ordinance was as follows:

Section 1. It shall be unlawful to conduct, operate or maintain any undertaking or embalming establishment, mortuary, funeral home, or any place for the purpose of caring for and keeping dead bodies, for holding funerals or for practicing the profession of undertaker, embalmer, mortician or funeral director in or on any part of the Avenue or the Boulevard hereinafter (in this section) described, or on or in any part of the walks or ways, or in or contiguous to any part of the Avenue or the Boulevard hereinafter (in this section) described, or on or in any part of any lot (by whomsoever owned) contiguous to any part of the Avenue or the Boulevard in the City of Miami, Dade County, Florida, hereinafter described, namely:

A. Brickell Avenue, between its northern and its Southern termini;

B. Biscayne Boulevard between the North side of Northeast 62nd Street on the North and the South side of Northeast 13th Street on the South;

C. Biscayne Boulevard between the North side of Northeast 6th Street on the North and the Southern terminus of said Boulevard.

Section 2 of the Ordinance was as follows:

"Section 2. It shall be unlawful to conduct, operate or maintain any undertaking or embalming establish-

ment, mortuary, funeral home, or any place for the purpose of caring for and keeping dead bodies, for holding funerals, or for practicing the profession of undertaker, embalmer, mortician or funeral director in or on any part of the Boulevard hereinafter (in this section) described, or on or in any part of the walks or ways, or in or contiguous to any part of the Boulevard hereinafter (in this section) described, or on or in any part of any lot (by whomsoever owned) contiguous to any part of the Boulevard in Miami, Dade County, Florida, hereinafter described, namely:

Biscayne Boulevard between the South side of Northeast 13th Street on the North and the North side of Northeast 6th Street on the South,

without first having obtained a written permit so to do from the Commission of the City of Miami, Florida, which permit may be granted by said Commission by resolution upon application therefor, upon showing to the satisfaction of the said Commission that the permitted occupation would not at the place and under the conditions in which it would be carried on be a nuisance or seriously impair the value of property in the vicinity or be against the public safety, convenience and welfare.''

Section 3 of the Ordinance provided for penalties for its violation.

Section 4 of the Ordinance provided as follows:

''Section 4. If section 1 of this Ordinance shall, for any reason, be adjudged void, or for any reason inoperative, with regard to the whole or any part of the area therein described, the area thereby excised from the provisions of said Section 1 shall be subject to the provisions of Section 2 of this Ordinance, with like effect as if originally contained in said Section 2.''

Section 5 declared the Ordinance to be an emergency measure.

Section 6 provided that the necessity of reading the Ordinance on two separate occasions is dispensed with by a four-fifths vote of the Commission.

John J. Skillman was arrested on an affidavit filed January 9th, 1931, charging a violation of the Ordinance. The violation of the Ordinance is alleged to have occurred on the 9th day of January, 1931, and is in five counts. Each count in effect charges that Skillman did unlawfully conduct, operate and maintain a funeral home on a lot contiguous to Biscayne Boulevard between the North side of Northeast 62nd Street and the South side of Northeast 13th Street, to-wit, in a building on the lot on the West side of Biscayne Boulevard fronting East on the said Boulevard and being between Northeast 19th Street and Northeast 18th Street and designated as No. 1822 Biscayne Boulevard.

Skillman sued out writ of habeas corpus contending that the Ordinance was invalid.

On hearing under an agreed statement of facts before the Circuit Court, petitioner was remanded to the custody of the Sheriff. From this judgment writ of error was sued out.

The Ordinance by its own terms declares the same to be an emergency measure. Therefore in this case the question as to whether or not it was an emergency measure is eliminated from consideration because this question is one which rests primarily in the judgment and discretion of the City Commission for determination. State ex rel. Swift vs. Dillon, 75 Fla. 785, 78 Sou. 29; Metropolis Publishing Co. vs. City of Miami, et al., 129 Sou. 913.

Section 5 of Chapter 14234 Special Acts of 1929 provided an amendment to chapter 10847 Acts of 1925, as follows:

"The Commission of the City of Miami may, by ordinance, provide regulations and restrictions governing the height, number of stories, and size of buildings and other structures, the percentage and portion of lot that may be occupied, the size of yards, courts and other open spaces and the location, use of buildings, structures and land for trade, industry, residences, apartment houses and other purposes."

This provision of the charter authorizes the City of Miami through its Commission by ordinance to exercise the power of zoning. The power of the legislature to delegate such authority to the governing power of the municipality has been recognized and determined definitely in this jurisdiction by the opinion and judgment prepared by Mr. Justice Terrell in the case of State ex rel. Taylor vs. City of Jacksonville, filed March 24, 1931, reported 133 Sou. 114. The opinion in that case may be said to settle every material question involved in this case except the question as to whether or not the business sought to be engaged in by the petitioner is within a class or classification which may be properly subjected to regulatory ordinances.

The business sought to be conducted by the plaintiff in error is that of a mortuary or funeral home. Section 3 of Chapter 10847, Extra-ordinary Session of 1925, authorized the City of Miami, among other things, "to regulate or prevent slaughter houses or other noisome or offensive business within the City * * * * * to regulate or prohibit * * * * * the existence of any dangerous or unwholesome trade or employment therein; * * * and generally, to define, prohibit, abate, suppress and prevent all things detrimental to health, morals, comfort, safety, convenience and welfare of the inhabitants of the City". Funeral homes, embalming establishments and mortuaries have long been held to be subject to regulation under police power,

and this before the modern practice of zoning became recognized as an attribute of municipal power.

It is contended here that because there exists a cemetery near the location of the proposed mortuary, though not fronting on the same street, that the mortuary would add nothing to the discomfort of the location. That other business enterprises which are properly subject to regulatory ordinances are conducted within the restricted area and are not affected by this or any other ordinance. It is also contended that there is a church located within a short distance of the mortuary and on the same street and that because funerals may be conducted from the church, it is an unwarranted discrimination to prohibit funerals being conducted from the proposed mortuary.

It is a well recognized fact that people throughout all ages have generally possessed what may be, or be akin to, horror of death. In the presence of a funeral home, it is hard for the average person to eliminate from his mind the depressing contemplation of death. When one looks upon a funeral home his thoughts naturally turn to the certainty of death and to the scenes of desolation and sorrow which within his experience have been occasioned by the grim reaper. When he looks upon a church he may have passing thoughts of the transition by death to another and different life, but if his thoughts dwell upon the edifice of the Church, the natural inclination is to think of what the Church means, of its promise, of hope of eternal life, of its being the House of God and a place where people may gather together and in mutual happiness give praise unto and worship the Universal Father.

Therefore, it must be accepted as a matter of common knowledge that while the contact with a funeral home may result in great discomfort in depression and unhappy

thoughts, the beholding of the Church should gladden the heart and bring pleasant thoughts to the beholder.

It may not be the unusual noise, noxious odors, or unsanitary conditions which make the funeral home obnoxious when established in any locality but certainly one reason why it is so is the fact that in and out of its doors day by day and night by night pass the dead followed by those who mourn and are grief-stricken because of the passing of their loved ones, throwing a shadow of sorrow over those who immediately surround the location. It is the natural inclination of people to shun as far as is convenient any association with a funeral home. Few people would choose as a place of residence a location adjoining or near to such an establishment.

The conducting of a funeral home in a particular locality may not be detrimental to the health, morals, safety or welfare of those surrounding and in close proximity to the establishment, but it is well within the province of the City Commission to determine that the location of such business will be detrimental to the comfort and convenience of those inhabitants of the city who immediately surround and are adjacent to the place where such business is conducted.

One of the best reasoned cases which we have had occasion to study during our consideration of this case is that of the City of Tucson vs. Arizona Mortuary, 34 Ariz. Rep. 495, 272 Pac. 923. In that case Mr. Justice Lockwood, in the opinion prepared for the Court, said:

"The leading case in the United States on the general regulation of the location of business establishments is undoubtedly that of Euclid vs. Ambler Realty Co., 272 U.S. 365, 54 A.L.R. 1016, 71 L. Ed. 303, 47 Sup. Ct. Rep. 114. In that case the village of Euclid had

attempted to regulate the location of practically all classes of business within its limit by what is known as a ''general zoning ordinance''. The entire village was divided into some six classes of 'use' districts, and these districts were classified rigidly in respect to the use to which buildings erected therein could be put. The Supreme Court of the United States, in discussing the constitutionality of such an ordinance, said:

'Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years urban life was comparatively simple, but with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably, would have been rejected as arbitrary and oppressive. Such regulations are sustained under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not to the *meaning* but to the *application* of constitutional principles, statutes and ordinances, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall.' ''

In the cases of Zehm vs. Board of Public Works, 274. U.S. 325, 71 L. Ed. 1074; Gorieb vs. Fox, 274 U.S. 603, 71 L. Ed. 1228; Nectow vs. Cambridge, 277 U.S. 183, 72 L. Ed. 842, the validity of ordinances dividing the city into districts and limiting the use of real estate within such districts to certain purposes has been sustained, it being held that in order for such ordinance to be declared unconstitutional it must affirmatively appear that the restriction is clearly arbitrary and unreasonable and has not any substantial relation to the public safety, health, morals, comfort or general welfare.

In the case of City of Tucson vs. Arizona Mortuary, supra, it is said:

"It is also contended that plaintiff had vested rights which were entitled to protection. Although 'it had purchased the land in question and let the contract for the building before the ordinance was adopted, yet before any material amount of construction had actually been done, it was fully advised that the ordinance was under contemplation. Instead of awaiting the action of the council, it apparently proceeded on the theory either that the ordinance would not be passed, or that, if passed, it was void. Having taken that chance, it may not now·be heard to set up any loss to it which arose from its actions *after* it had knowledge that the ordinance was being considered. But even if plaintiff suffered some damages through things occurring *before* the protest, financial loss, no matter how severe, does not of itself give parties a vested right to continue a business no matter how long it has been conducted, if the business is one whose location may be regulated under the police power. In the case of Hadacheck vs. Sebastian, 239, U.S. 394, Ann. Cas. 1917B 927, 60 L. Ed. 348, 36 Sup. Ct. Rep. 143, it appeared that plaintiff had long been engaged in the manufacture of

bricks in a certain location in Los Angeles, and that his property for that purpose was worth some eight hundred thousand dollars. Later the City passed a zoning ordinance which prohibited the use of the property for brickmaking, and in effect lowered its value to less than one hundred thousand dollars. The Court, however, held that his vested interest could not be asserted against the police power, stating:

'It is to be remembered that we are dealing with one of the most essential powers of government,—one that is the least limitable. It may, indeed, seem harsh in its exercise, usually is on some individual, but the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily. *A vested interest cannot be asserted against it because of conditions once obtaining. Chicago & A. R. Co. v. Tranbarger,* 238 U.S. 67, 78, 59 L. Ed. 1204, 1211, 35 Sup. Ct. Rep. 678. To so hold would preclude development and fix a city forever in its primitive conditions. There must be progress, and if in its march private interests are in the way, they must yield to the good of the community. The logical result of petitioner's contention would seem to be that a city could not be formed or enlarged against the resistence of an occupant of the ground, and that if it grows at all it can only grow as the environment of the occupations that are usually banished to the purlieus.' (Italics ours) Atlantic Coast Line R. Co. v. Goldboro, 232 U. S. 548, 58 L. Ed. 721, and cases cited, 34 Sup. Ct. Rep. 364.

It is, of course, true that in determining whether the general welfare requires interference with property rights by a zoning ordinance, municipalities should, and presumably generally do, consider, among other things, the loss to property owners by a restriction of the use of their property. This, however, is only one of the considerations on which the final decision is to be based.

Doubtless, if the value of the property rights destroyed is so great, as compared with the benefit done, that it clearly appears the ordinance is arbitrary and unreasonable, the courts will interfere, but if there can be any reasonable argument on the question the legislative will must prevail.''

We have quoted at some length from the Tucson case because the writer appears therein to have enunciated the law which must be applied to the instant case and the enunciation therein contained are in line with what was said by this Court in the case of State ex rel. Taylor vs. City of Jacksonville, supra.

The restricted district as established by the ordinance here under consideration is shown to be the designated parts of a certain avenue and a certain boulevard in the City of Miami, Florida, which avenue and boulevard constitute parts of one of the most traveled and most expensive thoroughfares in the South. The restricted area constitutes a very small portion of the great City of Miami. In this ordinance the city authorities have not attempted to confine the right to conduct a mortuary or funeral home within a limited area, but on the contrary, have by ordinance excluded a very limited area of the City from being used as the location for the operation or conduct of such business.

For the reasons stated, it appears that there was no error in the judgment to which writ of error was taken and the same should be affirmed. It is so ordered.

Affirmed.

ELLIS AND BROWN, J.J., concur.

WHITFIELD, P.J., AND TERRELL, J., concur in the opinion and judgment.

DAVIS, J., concurs specially.

DAVIS, J., (concurring) :

This is a habeas corpus case. The ordinance is not invalid or unreasonable in its terms, for the reasons pointed out by the Chief Justice. The plaintiff in error was therefore properly remanded. But the holding in this case cannot operate to justify unreasonable application of power to restrict property rights which under appropriate allegations and proofs may be protected in equity against any unreasonableness of an ordinance if such ordinance in fact unreasonably or unconstitutionally operates against a particular individual or property, in a particular case. I therefore concur.