SARAH C. BLITCH v. CITY OF OCALA.

195 So. 406
En Banc
Opinion Filed April 12, 1940

*H. M. Hampton,* for Appellant;

*Robert W. Smith,* for Appellee.

BROWN, J.—Appellant filed her bill of complaint against

the City of Ocala, Florida, alleging that she is and has been for many years a property holder in the city; that said property, consisting of three small cottages, is badly in need of repair, especially to the shingle roofs thereof, but that by reason of an ordinance passed by the city council on October 21, 1924, enacted after the cottages were built, she is prevented from making such repairs; that she has applied to the city officials for leave to repair the said shingle roofs with new shingles, but such application was denied, and that the property has thus become worthless to her as a source of income; and praying an injunction against the enforcement of the ordinance.

The ordinance complained of, adopted in 1924, in the nature of a building code, establishes inner and outer fire limits for the city; prescribes the type and kind of buildings that may be erected within each of such limits; provides what type of repairs shall be made; and requires permit to issue from the city manager before any construction or repair work on any building may be done within said limits.

The buildings owned by appellant are within the outer fire limits, and are now covered with wooden shingles. Appellant has sought to re-cover the dwellings with the same materials, but the necessary permits have been refused.

To the bill of complaint the City interposed a motion to dismiss which was granted. From the final order of dismissal, this appeal was taken.

The general authority of the City to enact such an ordinance is first questioned by appellant, it being her contention that the City did not have the authority to create fire limits or to provide for the different kinds of roofing to be used in the restricted areas.

Chapter 7676, Acts of 1917, the charter Act of the City

of Ocala, provided in the general welfare clause, *inter alia,* that the city "May define, prohibit, abate, suppress and prevent all things detrimental to the health, morals and comfort, safety, convenience, and welfare of the inhabitants of the city, and all nuisances and causes thereof. May regulate the construction, height and material used in all buildings and structures, and the maintenance, use and occupation thereof, within the corporate limits. May require, provide for, and compel the removal of ruins of any building or structure caused by either fire, storm, decay, or the act of man; shall have the power to remove, or to provide for and compel the removal, of any building or structure which the city council may deem to be unsafe, or in an unsafe or dangerous condition * * *."

This general grant of power is the only source from which the power to enact a valid, binding ordinance appertaining to fire limits may be obtained. There is, however, ample authority to sustain the holding that such a general grant of police power as that above quoted from the charter Act includes the power to enact ordinances reasonably designed to protect the inhabitants and their property from fire. See McQuillin on Municipal Corporations, Vol. 3, page 2061, Sec. 948; Dillon on Municipal Corporations, 5th ed., Sec. 727. In support of the general principle involved, see State v. City of Miami, 101 Fla. 585, 134 So. 541.

Ordinances such as the one here under consideration are enacted under the general police power, and "they must not (1) infringe the constitutional guarantees of the nation or State by (a) invading personal or property rights unnecessarily or unreasonably, (b) denying due process of law, or (c) equal protection of the laws, or (d) impairing the obligations of contracts; (2) must not be inconsistent with

the general laws of the State, including the common law, equity and public policy, unless exceptions are permitted; (3) must not discriminate unreasonably, arbitrarily or oppressively, and (4) must not constitute a delegation of legislative or executive or administrative power." McQuillin, Municipal Corporations, 2nd ed., page 119. See also, Hunter v. Green, filed this term.

We are next confronted with the question of whether or not the designation of the city manager under the conditions prescribed in the ordinance as to the person to issue permits for buildings and repairs is an unlawful delegation of a portion of the city's legislative power.

In City of Monticello v. Bates, 169 Ky. 258, 183 S. W. 555, it is aptly said of municipal ordinances:

"The rule is well established that municipal ordinances, placing restrictions upon lawful conduct or the lawful use of property, must, in order to be valid, specify the rules and conditions to be observed in such conduct or business; and must admit of the exercise of the privilege of all citizens alike who will comply with such rules and conditions; and must not admit of the exercise, or of an opportunity for the exercise, or any arbitrary discrimination by the municipal authorities between citizens who will so comply. City of Richmond v. Dudley, 129 Ind. 112, 28 N. E. 312, 13 L. R. A. 589, 28 Am. St. Rep. 180."

Section 2 (2) of the ordinance provides: "That no wall, structure, building or part thereof shall hereafter be built, enlarged or altered until a plan of the proposed work, together with a statement of the materials to be used, shall have been submitted to the City Manager, who shall, if in accordance with the provisions herein contained, issue a permit for the proposed construction."

The pertinent portions of Section 31 of the ordinance read as follows:

"Section 31. Roof Covering—(1) That all building except as given below shall have roof coverings of approved standard quality, such as brick, concrete, tile, or slate.; or highest grade of tin roofing; or asbestos shingles; of all built-up roofing felt with gravel or slag surface; or built-up asbestos roofing, or other roofing of light grades which would rank as Class "A" or Class "B" under the test specifications of National Board of Fire Underwriters.

"Exceptions: (A) Dwellings; (B) Frame Buildings; (C) Buildings not exceeding two stories or 30 feet in height and 2,500 square feet in area, and not used for factories, warehouses, or mercantile purposes.

"(2) The quality of roofing for all dwellings and other buildings exempted in paragraph (1), shall be as therein specified; or may be of a grade not lower than that indicated in the definition of approved fire-resistive roofing, as follows:

"The roofing shall at least withstand the attack of burning firebrands for five minutes with a wind pressure of five miles per hour, without ignition of the clear dry white pine decking beneath it, and shall not crack and expose the decking; * * * or of a grade which would rank not lower than Class "C" under the test specifications of the National Board of Fire Underwriters. * * *

"(6) If a wood shingle roof is to be repaired more than 10 per cent in any one year, the same shall be entirely replaced with materials specified in paragraph (1) of this section.

"(7) The building inspector shall have power to condemn and have removed any wood shingles roof that in

his opinion is in such deteriorated condition as to be excessively inflammable.

"(8)   Within twelve (12) years from the date of the approval of this ordinance any and all roofs covered with wood shingles shall be replaced with roof coverings which comply with this section."

It appears to be conceded in the briefs that the effect of this ordinance would be to prohibit the appellant from re-roofing her buildings with wooden shingles, as appellant applied for permission to do.   It also appears that paragraph 6 of Section 31 is applicable whether the building be located within or without the fire limits.

In the case at bar, the particular "test specifications of the National Board of·Fire Underwriters," are not set out in the ordinance, but "that may be considered as certain which may be made certain."   So the ordinance must be construed to apply only to the "test specifications" of said National Board which were then in effect, and not to subsequent changes in such specifications.   So construed, the meaning of the ordinance could be made certain, and its validity upheld.   If it should be held to mean, not only present, but also future specifications, or any changes therein that might be adopted by the National Board of Fire Underwriters, Section 31 of the ordinance would be invalid as being a delegation of authority to an outside board to alter a municipal ordinance.   Under such ambulatory construction, one property owner may have, in 1925, for example, roofed his home with a material "of a grade which would rank not lower than Class "C" according to the tests in force when the ordinance was adopted, whereas in 1930, the adjacent property owner might have made an attempt to roof his home with the same material, only. to find that, ·by reason of changes made in the specifications by said

National Board, the material was no longer in Class "C," and thus be foreclosed from using that roofing for his home. The ordinance so construed would not "admit of the exercise of the privilege of all citizens alike who will comply with such rules and conditions."

We must hold the ordinance, construed as above indicated, to be valid on its face, in spite of the impressive argument of counsel for appellant to the contrary, which appears to be supported by Cowley v. Northern Waste Co. (Mass.), 132 N. E. 365. Counsel also cites the case of State v. Fowler, 94 Fla. 752, 114 So. 435, but while adhering to the principles stated therein, we do not think the decision in that case is applicable on this point here. In that case, the Act provided that in adopting a code, the commissioner should use the *"basic principles* adopted by the sub-committee on plumbing of the Building Code Committee of the United States Department of Commerce as shown in the final report of said sub-committee under date of July 3, 1923, *with such additions as local climatic and other conditions may require."* (Emphasis supplied.)

In the case of Spencer v. Hunt, 109 Fla. 248, it was held that the Legislature, in enacting a statute regulating the practice of dentistry, and requiring license applicants to file diploma from an accredited dental college, as defined by the National Association of Dental Examiners, presumably knew the meaning of "accredited" and knew what dental colleges had been accredited by said association; and the validity of this provision of the statute was upheld.

Likewise in Pridgen v. Sweat, 125 Fla. 598, 170 So. 653, a similar ruling was made by this Court. In that case Section 10 of Chapter 14708, being an Act to regulate the practice of dentistry, and providing for a State Board of Dental Examiners, was under attack on constitutional

grounds. That section of the statute provided, among other things, that applicants for examination should be examined upon "such subjects as are taught in accredited dental schools." The Court held that this section should be construed in connection with Section 9 of the Act, which required that the applicant for examination shall file his diploma or certificate of graduation from an accredited college as defined by the National Board of Dental Examiners, the validity of which section had been upheld in Spencer v. Hunt, *supra*. That clause of Section 10 authorizing the board to examine applicants on "subjects taught in accredited dental schools" was sustained as being valid, but the provision authorizing examinations "on any other subjects" which in the board's discretion were deemed necessary" was held invalid and that it should be deemed as stricken from the Act, as it was vague and uncertain and delegated an unrestricted discretion in applying the law, which would open the door to discrimination as between applicants without redress.

We think these two cases are sufficient to uphold the constitutionality of that portion of the ordinance referring to the test specifications of the National Board of Fire Underwriters, as to Classes A and B and C as referred to in the ordinance. However, as these test specifications are not set out in the bill, or the ordinance as copied in part in the bill, we cannot say with any certainty that said tests are just and reasonable as applied to the plaintiff's property. We gather from the argument of counsel in their briefs that the effect of the ordinance, when considered in connection with the test specifications of the National Board of Fire Underwriters as such tests existed when the ordinance was adopted, would prevent the applicant from re-roofing her three cottages with wooden shingles.

The plaintiff in the court below, appellant here, alleges in her bill that she had owned cottages for many years and was the owner of the same at the time the ordinance of 1924 was adopted; that said ordinance established inner fire limits and outer fire limits, which are set forth in detail in the bill and that plaintiff's cottages were inside the outer fire limits; that when plaintiff erected these cottages in 1907, they were constructed of wooden material, to-wit, yellow pine, and covered with red cypress shingles, and that there was no ordinance in existence at the time which inhibited her from so doing; that said cottages were properly constructed and had not been changed except for minor improvements since they were built, and that she had at times had some controversies with the City about repairs of the roofs as being in excess of 10 per cent. That the cottages now are sadly in need of repairs, especially the roofs, and that she has applied on several occasions to the City for leave to put on her wooden shingles but her applications have been refused and she has been threatened with arrest if she reshingled her cottages with wooden shingles. That there is within the city, and within its fire limits, many other homes that are covered with wooden shingles, and were so covered prior to the passage of the ordinance and that the twelve-year limit in the 1924 ordinance (par. 8 of Sec. 31) has not been enforced against them; that the cost of the kind of shingles required under the ordinance aforesaid, and which the city manager would approve, far exceeds the cost of wooden shingles and that plaintiff is unable to put on shingles of the kind and type thus required; that she can re-cover the cottages with good wooden shingles of a kind that are authorized to be placed on buildings outside the fire limits, and without any great fire hazard, at a cost not to exceed $165.00 for each cottage, whereas any

other roofing which she would have to put on under the provision of the ordinance would cost her not less than $450 00 for each of said cottages, which sum she is not able to pay. That the rental of the property for many years has been very low, a large part of the time the houses have been vacant, and that during that period the taxes have been and are still very heavy, and her net income from the cottages very small. That the roofs are leaking and the tenants are demanding roofs and that within the next year or so the roofs will be utterly worthless, because she cannot afford to put on the kind of shingles demanded by the City, whereas if she was permitted to repair the buildings and put on wooden shingles, it would enable her to get some rent out of the property; but as it is the said ordinance, if enforced against her, would constitute a confiscation of her said property. That the City has acted arbitrarily toward her, as there are many other houses within the fire limits having wooden shingles.

While the question is a rather close one, we think these allegations tend to show that even though the ordinance may be valid on its face, yet, in the particular case here involved, it may not be constitutionally enforceable as against this complainant. Municipalities may be enjoined from unreasonably and arbitrarily exercising a lawful power conferred upon them by the Legislature, for such a power cannot lawfully be so exercised as to unnecessarily violate the organic rights of individuals. Cawthon v. DeFuniak Springs, 88 Fla. 324, 102 So. 250. Nor should there be any discrimination in the enforcement of ordinances. The Legislature may authorize a municipality to reasonably regulate the use of property by its owner when the owner's organic property rights are not thereby violated. State v. Fowler, 90 Fla. 155, 105 So. 735. In order to render a

zoning ordinance invalid, it must affirmatively appear that the restriction is clearly arbitrary and unreasonable and without substantial relation to the public safety, health, morals or general welfare. State v. City of Miami, 101 Fla. 585, 134 So. 541. The determination of such a question depends upon the facts of each particular case.

Thus in the case of Snedigar as Mayor of the City of Miami Beach, *et al.,* v. Keefer, 131 Fla. 191, 179 So. 421, this Court held that the evidence in that case was sufficient to authorize the Circuit Court to enjoin the enforcement of a municipal zoning ordinance which the City officers construed so as to preclude the use of a certain residence in a "modified business district" for the operation of a restaurant, on the ground that, as applied to the property involved, the provisions of the ordinance were arbitrary, unreasonable, discriminatory and well nigh confiscatory. Such was the finding of the master, and that finding was confirmed by the chancellor, and on appeal the chancellor's decree was affirmed by this Court. There was also an element of estoppel in that case, but this Court based its decision upon the finding that, as applied to plaintiff's property, the ordinance was unreasonable and bore no substantial relation to the public health, safety and welfare. See also City of Miami Beach v. State *ex rel.* Lear, 128 Fla. 750, 175 So. 537, and *Ex Parte* Wise, 141 Fla. 222, 192 So. 872.

Looked at from this standpoint, we think there was some equity in the bill and that its allegations were sufficient to call for an answer by the City, to determine whether or not, under all the circumstances, the ordinance here in question can be constitutionally applied and enforced as against the appellant's property, in view of the allegations of discrimination, unreasonableness, arbitrariness, etc., on the part of the City and its agents, and the further allega-

tion that no question of real fire hazard is involved, or if so, that it is a hazard which the City has been, and is, ignoring as to other property similarly situated.

The decree will therefore be reversed and the cause remanded for further proceedings not inconsistent with the foregoing opinion.

Reversed and remanded.

TERRELL, C. J., and CHAPMAN, J., concur.

BUFORD and THOMAS, J. J., dissent.

WHITFIELD, J., disqualified.