THE CITY OF MIAMI BEACH, a Municipal Corporation Organized and Existing Under the Laws of the State of Florida, v. OCEAN & INLAND COMPANY, a Florida Corporation.

3 So. (2nd) 364

En Banc

Opinion Filed June 13, 1941

Rehearing Denied July 18, 1941

*J. Harvey Robillard* and *Stapp, Ward & Ward,* for Appellant;

*E. L. Lockhart,* for Appellee.

*Thomas H. Anderson* as *Amicus Curiae.*

THOMAS, J.—In the chancery court a bill was filed against the City of Miami Beach to enjoin the municipality from enforcing the provisions of a zoning ordinance against certain property, which will be described later in this opinion, and from a decree in favor of the plaintiff, the defendant appealed. The matter has been presented here by counsel for the respective parties and the Court has heard argument of *amici curiae,* two in number, representing other owners of property, similarly situated.

In the course of our discussion we will refer to the parties litigant by their titles in the original proceedings.

Just before Lincoln Road, extending eastward from Bay Biscayne, meets the sea it passes the south end of James Street, three blocks in length, and less than two hundred feet farther on crosses the important thoroughfare called Collins Avenue. The plaintiff owns two tracts of land, one at the northwest corner formed by the intersection of Lincoln Road and Collins Avenue, with James Avenue as the west boundary, and one at the southeast corner, wtih the Atlantic Ocean as the east boundary. Incidentally, the property at the southwest corner of the crossing is owned by the client of one of the *amici curiae* and that at the northeast corner by the client of the other *amicus curiae.*

Ordinance numbered 289 adopted by the city commission of the City of Miami Beach, after a thorough survey of the past history and probably future growth of that extraordinary community, provided for business houses on Lincoln Road west of the lots we have described, that is, on the north side from James

Avenue westward and on the south side from Washington Avenue westward, while property abutting Lincoln Road east of these respective cross streets could be used only for hotel and apartment sites. It is sought by this litigation to have these restrictions originally imposed altered to allow the use of the property in question for business purposes the same as other lands adjoining Lincoln Road and the basis of the prayer for such relief is that the character of the surrounding property has so changed since the initial classification that there can no longer be found a "substantial relationship to public safety, welfare, morals, or health, in the continuance of the zoning restrictions now in force. . . ."

The background of the action of the legislative body in enacting the zoning ordinance and the consequent litigation is important. Growth of Miami Beach in three decades has been phenomenal, in large part, if not entirely, due to its attractiveness to those who would escape business cares, the rigors of northern winters and the ravages of disease. Situated on a narrow peninsula between the Atlantic Ocean and an arm of it known as Biscayne Bay, blessed with a warm climate and fanned by the southeast trades, it has become known as one of the earth's principal vacation places. A preponderant number of those who live there for long or short periods have come to play. It is not primarily a business or industrial center to which residence is incidental, but on the contrary it is principally populated by those who seek pleasure or health and business is secondary.

The general zoning plan so far as it relates to the immediate territory involved in this controversy provided for the construction of superior hotels and apart-

ments along the Atlantic Ocean, unquestionably one
of the main assets of the community, and for business
houses along Lincoln Road which runs approximately
at right angles with the beach. Where these two areas
of considerable length, but of little width, unite is sit-
uated the property of the plaintiff. The relief asked,
and granted by the chancellor, was permission to erect
business places in the region restricted to hotels and
apartments at its juncture with the area where that
use could be made of the property and it is insisted
that the character of the property in question is pre-
cisely the same as that along the remainder of Lincoln
Road from that place west. If we disregard the rela-
tive importance of the area along the beach and that
along the business street this is true. If one travels
along Lincoln Road eastward and does not bear in
mind the restricted area along the seashore there ap-
pears no logical reason why the last two blocks next
to the Atlantic Ocean should not be in the same cate-
gory as those along the remainder of the path he has
just trod. By the same token if one passes along
Collins Avenue, a thoroughfare from north to south
through the city, there seems no sensible ground for
intersecting the territory with a street devoted to
trade. If the character of the city as a resort and the
necessity to its well-being, of its charm for the
stranger are borne in mind; if the comparative im-
portance of store and hotel are considered when the
area allocated to the one strikes the district assigned
to the other and a choice must be made, the former
should give way.

At the juncture of these streets property which may
be devoted to business abruptly ends and that which
may be used for hotels and apartments as suddenly

begins but there must be a line of demarcation between them somewhere. See State *ex rel.* Townsend v. Farrey, 133 Fla. 15, 182 So. 448; Z. a. h. n. v. Board of Public Works, 195 Cal. 497, 234 Pac. 388.

The fact that his land is situated across the street from that on which commercial enterprises may be operated was not alone enough to support plaintiff's position that he should be given the same latitude in the use of his property. Were this the case it would be but a matter of time before alterations of the whole scheme by successively liberalizing the use of abutting property would result in disintegration and disappearance of the whole plan of zoning.

It is fundamental that one may not be deprived of his property without due process of law but it is also well established that he may be restricted in the use of it when that is necessary to the common good. So in this case we must weigh against the public weal plaintiff's rights to enjoy unhampered property acquired since the enactment of the ordinance. Such restrictions must find their basis in the safety, health, morals or general welfare of the community. State v. City of Jacksonville, 101 Fla. 1241, 133 So. 114; Blitch v. City of Ocala, 142 Fla. 612, 195 So. 406; Zahn v. Board of Public Works, *supra*.

In judging the merits of a controversy of this kind the facts peculiar to the particular case will govern (Blitch v. City of Ocala, *supra*) and the Court will not substitute its judgment for that of the legislative body of the city. Miller, *et al.*, v. Board of Public Works, 195 Ca. 477, 234 Pac. 381. In view of the nature of Miami Beach it is not important to consider here the indispensability of the restrictions to the health, the safety, the morals of the community but

only their necessity to the general welfare. We do not comprehend how it can be successfully urged that the maintenance of safety, health or morals are involved but only whether in the circumstances in this particular case the restrictions are so unnecessary to the general welfare of the inhabitants that the curtailment of the rights of the plaintiff are unreasonable and arbitrary.

We will determine the reasonableness of the regulations as applied to the factual situation meanwhile keeping before us the accepted rules that the Court will not substitute its judgment for that of the city council; that the ordinance is presumed valid (State v. City of Jacksonville, *supra*) and that the legislative intent will be sustained if "fairly debatable." Euclid v. Ambler Realty Co., 272 U. S. 365, 45 Sup. Ct. Rep. 114, 71 L. Ed. 303, 54 A. L. R. 1016.

In 3 McQuillin Municipal Corporations, Section 1048, appears a quotation from the Supreme Court of Wisconsin (State *ex rel.* Carter v. Harper, 182 Wis. 148, 196 NW 451) recognizing the principle that government through "the exercise of its police power may impose restrictions upon the use of property in the interest of public health, morals, and safety." The court added that there was doubt about whether there could be regulation "in promotion of the public welfare, convenience, and general prosperity" but it seems that the Supreme Court of Florida has recognized "public welfare" as a purpose for which such restrictions could be imposed. In the Wisconsin case it is further pointed out that aesthetic considerations have also been recognized and we think what is said in the opinion is particularly relevant to the community of Miami Beach because of its general character which

we have briefly described. It is difficult to see how the success of Miami Beach could continue if its aesthetic appeal were ignored because the beauty of the community is a distinct lure to the winter traveler.

In the Wisconsin case reference is made also to the many benefits which may spring from zoning such as the attraction to select citizenship, civic pride, the happiness and contentment of the citizens and the stabilization of the value of the property and general peace and good order. All of these elements are especially appropriate in connection with the City of Miami Beach.

It seems that if one observes the forest instead of the trees the advantages of the zoning ordinance under attack are immediately apparent and that the enforcement of the ordinance encompassing the whole plan will redound to the benefit of all without oppression or injustice to plaintiff of any one in like position.

We do not find in the ordinance meanwhile conscious of the presumption of the correct exercise of the discretion of the city council to deal with zoning within their jurisdiction, the earmarks of arbitrariness and unreasonableness which would justify judicial interference.

The limitation of the use by the plaintiff of his property seems a fair, just and reasonable contribution to the economic good, the prosperity, the welfare of the whole community and not so burdensome that it contravenes the organic inhibition against deprivation without due process.

Reversed.

BROWN, C. J., concurs specially.

WHITFIELD, TERRELL, BUFORD and CHAPMAN, J. J., concur.

ADAMS, J., not participating.

BROWN, C. J. (concurring specially).—As one of the early residents of Miami Beach, I take pleasure in concurring in all the good things which Mr. Justice THOMAS has to say in the foregoing able opinion about that marvelously beautiful and attractive city by the sea; which, by the way, it is not denied, has always been a well-governed city. When I first saw the property involved in this case, in the spring of 1915, the year in which the town was incorporated and which was about three years before I moved over from Miami and became a resident, I only recall one house in that immediate section, and that was the home of the Beach's great developer, Mr. Carl G. Fisher (who had theretofore been interested in Miami and Miami Beach by Mr. J. N. Lummus, Sr., the first mayor and pioneer developer of the southern portion of Miami Beach, and by the present and oftentimes mayor, Hon. John H. Levi) which home was then in course of construction. This home was being built on the northern portion of Block 55 of "Fisher's First Subdivision of Alton Beach," the plat of which was placed on record in 1914. Block 55 is bounded on the north by Lincoln Road, on the west by Collins Avenue, and on the east by the Atlantic Ocean. The plaintiff in this case owns Lots 7, 8, 9, 10, 11, and 12 of Block 55, being the northern six lots of that block, upon which the Fisher home was built. Not very long thereafter another beautiful home was built across the street on the north side of Lincoln Road, in the southern part of Block 29. My recollection is that this residence was built by Mr. John Hannon, the shoe manufacturer, who later sold it to Mr. Seiberling, the auto tire manufacturer, who still later sold it to Mr. Horlick, of "malted milk" fame.

It appears from the record in this case that the lots upon which this residence was built now belong to the Horlick estate. I recall passing on the title to this property for Mr. Horlick some seventeen or eighteen years ago when I was practicing law in Miami. It was not very long after the Fisher home was built before this entire section near the ocean front was studded with beautiful homes surrounded by spacious grounds. Both of these old home sites, fronting the ocean at the eastern end of Lincoln Road, are zoned for hotel and apartment uses. The weight of the evidence is to the effect that these properties are splendidly adapted to the uses for which they are zoned, and no sufficient reason, in my opinion, is shown to set aside the zoning restrictions as to these lots. The old Hannon home-site, now the property of the Horlick estate, is not directly involved in this case, but I think it is indirectly involved, the situation and the zoning restrictions being the same.

Plaintiff also owns Lots 1, 2, and 3, in Block 30. These are the south three lots of Block 30 and are bounded on the south by Lincoln Road, on the east by Collins Avenue and on the west by James Street. All of these lots, and those in the immediate vicinity, were restricted by the original subdivider to private residential use. But in the course of years the character of the neighborhood changed, and these restrictions were removed, in the first instance by court proceedings. See Osius v. Barton, 109 Fla. 556, 147 So. 862 (a decision in which the writer did not participate) and Osius, *et al.,* v. Barton, 129 Fla. 184, 176 So. 65. The Osius property was located in the northern part of Block 54, across Collins Avenue from the Fisher home, and extended along the south side of Lincoln Road westward to Washington Avenue. A

client of one of the *amici curiae* in this case owns several of these lots, running from Collins Avenue westwardly along Lincoln Road. In the early days of Miami Beach this Fisher's First Subdivision, east of Washington Avenue, contained the highest class residential property in the city and I never dreamed at that time that it would be used for any other purpose. But times have changed and due to the rapid growth of Miami Beach, conditions have changed with them. In his able master's report in this case, Judge John C. Gramling, who, as I recall, was one of a group who were associated with Mr. J. N. Lummus, Sr., either as an attorney for or as a stockholder in the Lummus Company, in the development of the southern portion of Miami Beach, which this great pioneer developer, Mr. Lummus, began in 1912, has this to say of Lincoln Road as it is today:

"More distinctive and individual than any other street of said city is the cross street known as 'Lincoln Road,' which is between 16th Street and 17th Street. This street was early designated as a business use street and has with the growth of Miami Beach been developed as such. Great progress has been made in the development of this street as a high class shopping district, where shops known throughout the United States are located."

The 1930 zoning ordinance of the City of Miami Beach, adopted only after careful study and many public hearings, designates most of Lincoln Road as a high class and restricted business district, extending from a point west of Alton Road, and not very far from Biscayne Bay, eastward for about a mile to the corner of James Street on the north side of Lincoln Road and to Washington Avenue on the south side, thus

affording a high class business district of considerable proportions. James Street is a short street three blocks long, running from 19th Street on the north to Lincoln Road on the south. So we have Lincoln Road opened up for business for a distance eastward one block further on the north than on the south. Thus lots 1 to 6 inclusive of Block 31 on the north side of Lincoln Road can be and are being used for business purposes, whereas lots just across the street, being Lots 11, 12, 13, 14, 15 and 16 of Block 54, are restricted to multiple family uses. A number of the city's own witnesses in this case testified that the business district on the south side of Lincoln Road should be extended eastward to a point opposite the foot of James Street on the north side, so as to make the permitted usage of the property the same on both sides of the street. In the light of the evidence in this case, I think this contention is reasonable and well founded. Indeed, the evidence indicates to my mind that ultimately, and perhaps quite soon, the growth of Miami Beach will require that the high-class-business-use portion of Lincoln Road be extended by the city's governing body all the way eastward to Collins Avenue, or to within about 100 feet of said avenue, and that the city authorities will probably take such action of their own accord. But, on the evidence in this record, the question as to whether or not this should have been done as to the property east of James Street, shortly before or at this time this case was tried in the circuit court, was and is a debatable question.

The city introduced in evidence a number of communications which had been addressed to the Lincoln Road Association and to the city council with reference to the petition of certain property owners

involved in this case for the modification of the zoning ordinance so as to permit the eastward extension of the business use of Lincoln Road so as to embrace their. properties in the business district. I was very much impressed with one or two paragraphs in one of these letters. It is true this letter was written about a year and a half ago but it reflects some of the many factors which the city council had to consider in arriving at their decision on these petitions.

It reads in part as follows:

"As a year round resident and property owner, I am interested in the progress of Miami Beach, and feel that my reaction to a change in the zoning restrictions on Lincoln Road might be similar to that of the average thoughtful citizen.

"Lincoln Road as it is today did not just happen; it is the answer to the best thought of many conscientious and capable city councilmen, in addition to many smart, versatile and experienced merchants.

"It is a recognized fact, that expansion that is too rapid has caused the depreciation or destruction of innumerable communities and businesses.

"If possible, this should be avoided on Lincoln Road, which, in recent months, has greatly exceeded conservative growth.

"The future high standard and prosperity of Lincoln Road will certainly be seriously affected by any change in the zoning restrictions, at this time. The welfare of the community should not be jeopardized or sacrificed for the personal profit of a few individuals."

The city council referred this matter of changing zoning restrictions on Lincoln Road to the Zoning Board of Adjustment, from whose report to the city council we quote the two concluding paragraphs:

"Accordingly a hearing was called for three P. M. January 10 pursuant to notices having been sent to all property owners within three hundred and seventy-five feet of this property. During the course of the hearing a number of people presented their views relative to the proposed change and relative to certain further extensions of the Lincoln Road business district and also of an extension southward on Washington Avenue. In the aggregate during the course of the hearing, owners of twenty-eight hundred and forty-two front feet of property which is now classified in the "Re" district requested that the Board also consider recommending changing their property so that it would be available for business uses. Requests involved all of the property fronting on Lincoln Road from Washington Avenue to the ocean, and on Washington Avenue from Lincoln Road to Sixteenth Street.

"After giving careful consideration to the evidence adduced at the hearing and having examined carefully the conditions now existing generally in this territory, and particularly having investigated the store vacancies on Lincoln Road and the vacant property on that thoroughfare still available for business, it is the opinion of the board that any extension of business property at this time in that territory would in the final analysis be detrimental to the present owners of business property and probably would not be beneficial to the owners of the property who now seek to change their holdings from "Re" to business classification, and that any such change at this time would contribute nothing to the general welfare of the city, but would on the other hand in the aggregate be detrimental to all property on and near Lincoln Road. We therefore

recommend that no change be made in the present use classification of Lincoln Road property."

This report and recommendation was made on January 17 of last year. It will be noted that they recommended that no changes be made "at this time" in the "present use classification" of Lincoln Road. Thus the Board itself recognized that changes in conditions might sooner or later require some changes in the "use classification," and evidently had in mind the principle expressed by this Court in the recent case of Forde v. City of Miami Beach, 146 Fla. 676, 1 So. (2nd) 642, wherein it was said:

"The object of all use zoning, in a measure at least attainable, should be to put the land to the use or uses to which it is best adapted, and the result will normally be to increase values. That the governing body of the City of Miami Beach had his principle in mind when the zoning ordinance was adopted ten years ago is indicated by the marvelous growth of this municipality. Such a zoning plan should be sufficiently stable to protect those who comply with the law, but at the same time, it should be susceptible to change, so that it can be altered to meet changing conditions not adequately recognized or not possible to foresee when the ordinance was adopted."

In the case of Cawthon v. Town of DeFuniak Springs, 88 Fla. 324, 102 So. 250, this Court, speaking through Mr. Justice WHITFIELD, said:

"The Legislature can legally authorize the exercise of the police power only for proper purposes and only to the extent that is necessary to conserve the public welfare in the premises."

And in State *ex rel.* McAuley v. York, 90 Fla. 625, 106 So. 418, this Court held that:

"When an ordinance is within the grant of power to the municipality, the presumption is that it is reasonable, unless its unreasonable character appears on its face, and the person attacking it as unreasonable or unjustly discriminatory must assume the burden of affirmatively showing that, as applied to him, it is unreasonable, or unfair and oppressive."

The evidence in this case is extremely interesting, consisting as it does of the testimony of quite a number of well known citizens of Miami Beach, including former Mayor Snedigar, as well as that of two expert students of zoning—Mr. Harland Bartholomew of St. Louis, Mo., and Mr. E. D. Keefer of Miami Beach, and the testimony shows quite a variety of viewpoints and opinions. Many factors necessarily entered into the consideration of the matter by the city council in arriving at its decision, made some months ago, to let the zoning restrictions stand as they were at that time.

When it comes to a mere matter of opinion, the writer would not place his own personal opinion against that of the city council of Miami Beach, for whose members he has high respect, nor, for that matter, against that of the circuit judge who tried this case in the court below and who reached a different conclusion from that of the city authorities. However, the general statement that the courts should not substitute their judgment for that of the city's legislative body, in any case, is a bit too broad. Taking that statement literally, the courts could never set aside any ordinance. When it comes to the protection and enforcement of the basic constitutional rights of personal liberty and private property, and as to how far these rights must be modified by the imperative requirements of the general welfare, as expressed in the

exercise of the police powers, the courts are compelled to weigh the evidence for themselves and to construe and protect those rights in the light of the facts which they find to be proven by the weight of the evidence. That, I am sure, is what the learned circuit judge endeavored to do in this case, and what the members of this Court are endeavoring to do in reviewing his very persuasive opinion and judgment. I think that the rule on his subject was correctly stated by the Supreme Court of the United States in the leading case of Euclid v. Ambler Realty Company, 228 U. S. 365, 71 L. Ed. 303, 47 S. C. 114, 54 A. L. R. 1016, wherein, speaking through Mr. Justice SUTHERLAND, it said:

"If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control."

Giving due operation and effect to this rule, I agree with the majority of the Court that on the evidence in this case the zoning restrictions here involved should have been left undisturbed by the trial court. As to a question indirectly involved here, my own view is, as above stated, that the city's own action in extending the business district of Lincoln Road eastward to James Street on the north side of Lincoln Road is such strong evidence that such district should also be extended a corresponding distance on the south side of Lincoln Road as to leave that question, when considered in connection with the testimony as a whole, no longer "fairly debatable," and would require appropriate action, either by the city council or by the courts, if properly invoked, to bring this about, the effect of which would be to open up for business uses (of the character already in force to the west of there) Lots 11, 12, 13, 14, 15 and 16 of Block 54, fronting on

Lincoln Road, and running west to Washington Avenue. But I agree with the majority of the Court that the question as to whether the business use of Lincoln Road should be still further extended, so as to remove the present zoning restrictions from plaintiff's three lots at the N. W. corner of Lincoln Road and Collins Avenue, is such a debatable question on the evidence in this case, that the zoning ordinance should be left undisturbed as to those lots.

As indicated above, I also agree with the other members of the Court that the present zoning restrictions on plaintiff's property on Lincoln Road between Collins Avenue and the ocean should be left as they are. While there was some conflict in the testimony, I think the weight of the evidence supports the reasonableness of such zoning restrictions.

I therefore concur in the judgment of reversal.