72

**WOMETCO ENTERPRISES, Inc. v. CITY OF WEST PALM BEACH.**
No. 74-1980-CA(L)-o1-G.

**STEWART PONTIAC CO. v. CITY OF WEST PALM BEACH.**
No. 74-2720-CA(1)-o1-G.

Circuit Court, Palm Beach County.

January 15, 1976.

Eugene P. Spellman, Miami, for Wometco Enterprises, Inc.

Prior & Pruitt, West Palm Beach, for Stewart Pontiac Co.

James L. Watt and Larry Klein, both of West Palm Beach, for the City of West Palm Beach.

LEWIS KAPNER, Circuit Judge.

In 1973, the city of West Palm Beach passed a sign code regulating outdoor advertising within the city. Petitioners Wometco Enterprises, Inc., d/b/a Outdoor Media, and Stewart Pontiac Company, on its own behalf and on behalf of all other commercial proprietors within the city of West Palm Beach, have challenged this code, alleging it to be unconstitutional. The parties will be referred to as the city, Wometco and Stewart, respectively. The sign code will be referred to as the sign code, code or ordinance.

The city has moved to dismiss Stewart's action as a class action. There is some merit to the city's position, but for the most part the points raised by Stewart are sufficiently in common with all other commercial proprietors in West Palm Beach to justify considering their petition as a class action. Accordingly, the city's motion to dismiss Stewart's action as a class action is denied.

Petitioners have raised several points and the case has been well-presented on all sides. The court finds merit in some of the points raised by petitioners and finds that portions of the act are invalid; but, as a matter of propriety and practicality, the court will discuss all the points independently.

### (I)
#### WERE THE MEETINGS OF THE SIGN CODE COMMITTEE IN VIOLATION OF THE SUNSHINE LAW ?

The court finds from the evidence that the meetings in question were open to the public, the city made an adequate attempt to inform the public and, in fact, the public was informed. Therefore, the court finds that the meetings were not in violation of the Sunshine Law.

### (II)
#### IS THE ORDINANCE A VIOLATION OF THE FIRST AMENDMENT GUARANTEE OF FREE SPEECH ?

The guarantee of free speech is applicable to billboards as well as other forms of communication, commercial messages as well as non-commercial, repugnant ideas as well as appealing ones, and matters of little import as well as matters of the "highest public interest and concern" (See *New York Times v. Sullivan,* (1964) 376 US 254, 266, Sup. Ct. 710, 718).

If the ordinance in question concerned itself with the *contents* of the billboards, or if the intent of the city council was *to suppress information,* then a violation would result. This is not the case here. Notwithstanding petitioners' comparison of "girlie type" signs with United Way appeals, the parties agreed at the hearing, and the evidence established, that the goal of the city was aesthetics and not suppression of ideas, and that the contents of the billboards were immaterial to the enactment of the ordinance.

A law does not violate the First Amendment simply because it has an influence upon communications since virtually every law has such influence to some degree, zoning laws and building regulations being prime examples. There comes a point with respect to laws affecting vehicles of communication when physical and general characteristics of the vehicle become primary and communicative characteristics of the vehicle become secondary. When the law affects the vehicle generally with other vehicles similarly situated, and the impact upon the communications nature of the vehicle is secondary or incidental, then the law does not violate the First Amendment. Who, for example, would argue that a zoning prohibition against businesses in a residential zone violates the right of free speech simply because printing presses, TV stations and the like would be prohibited from operating in that zone?

Such is the case here. The ordinance affects structures or signs and not the contents of the structures or signs and the goal is aesthetics and not suppression. The action of the city is presumed to be valid and nothing has been presented to overcome that presumption. It is thereupon found that the sign code does not violate the right of free speech.

### (III)

#### IS AESTHETICS ALONE A SUFFICIENT BASIS FOR THE ADOPTION OF THIS SIGN CODE IN THE CITY OF WEST PALM BEACH ?

##### (A)

It is well established in Florida that aesthetics can be the sole reason for regulating outdoor signs. *Sunad, Inc. v. City of Sarasota,* (Sup. Ct., 1960) 122 So. 2d 611; *City of Miami Beach v. Ocean and Inland Co.,* (Sup. Ct., 1941) 3 So. 2d 364. Both these decisions stressed the nature of Sarasota and Miami Beach as tourist, cultural and/or artistic communities as opposed to commercial communities, but those decisions did not hold that consideration of aesthetics was limited only to communities given that magic designation What must be shown is not whether an area is a "tourist community", or an "artistic center", or an "industrial center', or any other "type" of community, but simply — (1) Whether the nature of the aesthetic goal is reasonably related to the nature of the community and, (2) whether the means used to achieve that goal are reason-

able. In judging this issue, the facts peculiar to the particular community will govern and the court will not substitute its judgment for that of the legislative body of the city. Such ordinances are based on political judgments of cities' governing bodies and are valid. They will be sustained if the issues are fairly debatable. *City of Miami Beach v. Ocean and Inland Co., supra; Euclid v. Ambler Realty Co.,* 272 US 365, 47 Sup. Ct. 114, 71 Lawyers' Edition 303, 54 ALR1016. It is true that both *Sunad* and *Miami Beach* stressed the unique character of the communities of Miami Beach and Sarasota, but there was no indication in those cases that the court intended to confine consideration of aesthetics to tourist or artistic communities only.

In *Miami Beach,* for example, the Supreme Court was ebullient in its praise for "that marvelously beautiful and attractive city by the sea, which ... has always been a well-governed city,"\* but, both the majority and concurring opinion in that case relied heavily upon the general rule established by the landmark case of *Euclid v. Ambler Realty Co., supra* — "If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control." This rule is certainly broad enough to include communities other than tourist or cultural centers.

Aditionally, in *Miami Beach,* in referring to the case of *State ex rel. Carter v. Harper,* 182 Wis. 148, 196 NW 451, 33 AL 269, upon which it relied, the court said —

> "In the Wisconsin case, reference is made to the many benefits which may spring from such zoning such as the *attraction to select citizenship, civic pride, the happiness, and contentment of the citizens and the stablization of value of the property and general peace and good order."*
> (Emphasis added.)

These considerations apply with equal validity to any community, whether tourist, residential, rural, artistic, historical, cultural, commercial, industrial, or what have you.

Referring specifically to Miami Beach, the court, at page 366, was distinctly influenced by the city's concern over those who came to reside as well as to vacation —

> "A predominant number of those who live there for *long* or short periods have come to play. It is not primarily a business or industrial center to *which residence is* inci-

---

\*The modern reader may have difficulty in identifying this description with the present city of Miami Beach, but it must be remembered that this opinion was rendered in 1941.

dental, but on the contrary principally populated by those who seek pleasure or health, and business is secondary." (Emphasis added.)

The principle underlying this statement is equally applicable to any community that wishes to make itself more attractive to residents. Indeed, cities all over the nation are trying desperately to rectify the blight that has occured in their communities and the fact that these communities are not "tourist areas" should not prevent them from attempting to improve the beauty of their cities.

People who work and live in a community are not necessarily more indifferent to the beauty of that community than those who visit for vacation. Aesthetic considerations are a proper goal for any community. So long as the considerations are reasonably related to the nature of the community and the means by which the goals are implemented are reasonable and not inconsistent with the constitutional freedoms guaranteed the people, laws passed pursuant to those goals will be upheld. *Fucid v. Ambler Realty Co., supra.* See also *Berman v. Parker,* 348 US 26, 73 Sup. Ct. 98, 99 Lawyer's Edition 27 (1954), which held —

The concept of public welfare is broad and inclusive. The values it represents are spiritual as well as physical; aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy; spacious as well as clean; well-balanced as well as carefully patrolled."

In this particular case, the court finds that the goals underlying the sign code are reasonablely related to the type of community West Palm Beach is , even accepting petitioners' description of the city as a "commercial center." Going one step further, though, the court finds that the city of West Palm Beach is not strictly speaking a "commerical" as opposed to a "tourist" community. Just as it is a "core of activity" with respect to outdoor advertising, it is also a "core of activity" with respect to the tourist industry of Greater West Palm Beach. Not only are there many tourist attractions within the city itself (municipal auditorium and stadium, museums, movies, etc.,) but it is clear that failure to preserve its beauty could persuade many potential tourists and residents to vacation, reside, or for that matter work, elsewhere. The economic well-being of West Palm Beach is dependent upon both the city and its surrounding areas attracting tourists, working residents and retirees. It is difficult to see how the success of the city could continue if its aesthetic appeal were ignored.

(B)

The case of *Sunad, Inc. v. City of Sarasota, supra,* cited by Wometco and Stewart, is not inconsistent with the above statements. That case held an ordinance similar to this one to be un-

constitutional because by completely prohibiting the industry involved — outdoor advertising — and by having no relationship between the potential goal and actual effect, it was unreasonable and arbitrary and, therefore, unconstitutional.

In this case however, the court finds, that the regulation does not amount to prohibition, and that the goals are in fact reasonably related to the accomplishments of the ordinance. As stated in *E. B. Elliott Advertising Co. v. Metropolitan Dade County*, 425 F 2d 1141 (5 CCA, 1970) —

> . . . there is a real difference between the outdoor advertising activity that *must necessarily be carried out on the premises where a businss is located in order that it may identify itself* and attract customers, and outdoor advertising which is carried out as a business in itself and which *conveys commercial messages unrelated to the other uses to which the premises may be devoted.* As was said in Morey v. Doud, supra, 354 US at 466, 77 Sup. Ct. at 3550:
>
> > "Of course, distinction in the treatment of business entities engaged in the same business activity may be justified by genuinely different characteristics of the business involved . . . But distinctions cannot be so justified if the 'discrimination has no reasonable relation to these differences.' "

> Moreover, the classification is reasonable in light of the purpose of Ordinance No. 63-26: - The promotion of highway safety and highway beautification, - in that the removal of outdoor advertising signs which are not related to the operation of a business on the premises on which they are located *will tend to reduce the overall number of outdoor advertising signs* and thereby reduce the number of driver distractions and the number of aesthetic eyesores along the expressways of Dade County. As was noted earlier, *"reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."* Williamson v. Lee Optical of Oklahoma, supra, 348 US 489, 75 Sup. Ct. at 465. (Emphasis added.)

I would further state, although it may be considered a minor point, the permitted use of time and temperature signs generally is a proper distinction from other forms of outdoor advertising so long as anyone may use them on an equal basis.

### (C)

Wometco argues persuasively that the sign code will cripple the outdoor advertising industry. The code does seriously impair the industry, but it does not amount to a complete prohibition. Also, a community may, in the interest of aeshtetics, prohibit an industry if the nature of that goal is reasonably related to the nature of the community and the means used to achieve that goal are reasonable. A prohibition of billboards in Hershey, Pa. (an industrial community) may well be valid whereas a similar ordinance in Las Vegas

(a tourist community) may be deemed invalid. *Sunad* found that the *goal* of the ordinance *was* proper but its *effect* (putting petitioner out of business) was an unreasonable and discriminatory means of accomplishing those goals. Such is not the case here.

With respect to Wometco's argument concerning standardization of the outdoor advertising industry and its conflict with the sign code, the court holds that it is permissible for communities to control their own character (within constitutional limitations) as opposed to giving national industries the power to impose their standards on every city and village in the country. Ordinances of this type present mixed questions of social economics which a *political body* may take into consideration and, in fact, the state of Florida may very well have considered them in confining the removal of outdoor signs adjacent to roads and highways on the federal interstate or primary highway systems to the state rather than to individual communities (§479.15(3), Florida Statutes). But, these considerations do not, in this case, permit the court to impose them as a matter of consitutional proscription so as to invalidate the ordinance.

### (IV)
### IS THE SIGN CODE A ZONING ORDINANCE OR AN ORDINANCE ADOPTED AS PART OF THE GENERAL POLICE POWERS OF THE CITY?

It is here that the bulk of the ordinance must fall.

It is true as the city points out and the court has ruled that a city has the power to regulate outdoor signs without resorting to the zoning power. However, when a city attempts to enact such regulations via the zoning powers, it must conform to procedures set out for enacting such ordinances. Whether a particular ordinance is a zoning ordinance or not is a question of fact, and the label which the city chooses to place on the ordinance may be relevant in determining the city's intent, but is not controlling in determining the nature of the ordinance. Substance, not form, controls. See *Ellison v. City of Fort Lauderdale,* (Sup. Ct., 1966) 183 So. 2d 193.

(If the present code is determined to be a zoning ordinance, the city concedes that the ordinance is invalid as it was not passed according to the procedural steps required by the city charter for zoning ordinances.)

The distinction between ordinances adopted under the zoning power and those adopted under the general police power is of substantial importance. As our Supreme Court pointed out in *Ellison v. City of Fort Lauderdale, supra —*

   ". . . zoning power is justified only as an exercise of the general police power (footnote omitted) but this will not permit a municipality to evade the *protections thrown about the citizen's use of his property by the legislative limitations imposed on the zoning power* by the device of labeling a

zoning act a mere exercise of police power. (Footnote omitted.) Specific grants by the legislature always limit general grants. The specific grant of zoning power is conditioned by the provision for notice and public hearing." (Emphasis added.)

The *Ellison* case held that an ordinance prohibiting the keeping of horses on land zoned R-O was a zoning ordinance rather than an exercise of the city's general police power relating to health, morals and general welfare, and was, therefore, invalid because the city failed to follow the proper procedure for enacting a zoning ordinance.

In the instant case, a substantial portion of the sign code relates to the use of property within respective zones, and also to restrictions as to sizes and types of these signs. Section 9.05(6), Charter of the City of West Palm Beach, dealing with the comprehensive development plan of the city, includes these very concepts —

> "Zoning, planned subdivisions, setbacks and other building line restrictions, location, height, bulk, sizes and type of buildings and other structures . . . and permissible uses of land, buildings and other structures in various zones . . . "

The city has cited the case of *Eskind v. City of Vero Beach,* (2nd DCA, 1962) 150 So. 2d 254, wherein a sign ordinance passed under the general police powers of the city was upheld, but in that case the issue of the ordinance's character as a zoning ordinance or an ordinance under the general police powers was not raised. By the same token, the cases *of Hugh v. Amato,* (1st DCA, 1968) 212 So. 2d 662, and *Miller v. MacGill,* (1st DCA, 1974) 297 So. 2d 573, involved ordinances similar to the ordinance in this case. Those ordinances were enacted as zoning regulations, but the issue of the character of those ordinances was not raised in those cases either. See, also, *Skaggs v. City of Key West,* (3rd DCA, 1975) 312 So. 2d 54.

Accordingly, the court finds and holds that the following sections of the sign code are zoning ordinances and, therefore, invalid — §§3-30, 3-33, 3-35(B), 3-35(C), 3-36, and 3-38. The other sections are deemed not to be zoning regulations and are consequently valid, except as may otherwise be determined in this order.

(V)

DOES SECTION 479.15, FLORIDA STATUTES, INVALIDATE THE SIGN CODE?

Section 479.15 provides as follows —

(1) No zoning board or commission nor any other public officer or agency shall permit any advertisement or advertising structure which is prohibited under the provisions of this chapter nor shall the department

permit any advertisment or advertising structure which is prohibited by any other public board, officer or agency in the lawful exercise of its or their powers.

(2) No municipality, county, local zoning authority, or other political subdivision shall remove, or cause to be removed, any advertisement or advertising structure without paying compensation in accordance with §479.24(1). Said compensation may, at the discretion of the political subdivision, be paid out of secondary road funds available to that political subdivision.

(3) The removal of outdoor advertisements or advertising structures adjacent to roads or highways on the federal interstate or primary highway systems shall be the sole responsibility of the department of transportation.

This section does not prohibit a city from regulating or even prohibiting outdoor advertising. Section 479.15(1), as pointed out by the city, recognizes this fact — "(1) . . . nor shall the department permit any advertisement or advertising structure which is prohibited by any other public board, officer or agency *in the lawful exercise of its or their police powers.*" (Emphasis added.) The issue here, of course, is whether the city's prohibitions are within the lawful exercise of its powers.

Section 479.15 establishes certain limitations upon attempts by cities to regulate or prohibit outdoor advertising. Specifically, §479.15(2) sets out general rules requiring compensation for the removal of signs by cities and other political subdivisions, and §479.15(3) prohibits removal by cities of outdoor advertisements or advertising structures which are adjacent to roads or highways on the federal interstate or primary highway systems.

The rule requiring compensation in accordance with §479.24(1)* is clear, but the language in §479.16(12), exempting such signs from this chapter, is clear also. The two sections appear to be inconsistent as it applies to this case but, even though §479.15(2) was enacted subsequent to §479.16(12), I see no reason to conclude that the legislature intended to repeal the latter. Accordingly, the

---

* Florida Statutes §479.24(1) — "Compensation shall be paid upon the removal of all signs lawfully in existence on December 8, 1971 or signs lawfully erected which later become nonconforming. Compensation for any sign erected or completed after December 8, 1971 shall be limited to the actual replacement value of the materials in such sign. It is the legislative intent that any person erecting or completing such asign after December 8, 1971 shall be fully compensated by the method herein provided."

court finds that section §479.15(2) does not require compensation in accordance with section §479.24(1).

On the other hand, §479.15(3), in my opinion, clearly provides that the state has pre-empted the area of sign removal with respect to signs adjacent to roads or highways on the federal interstate or primary highway systems. What else can the words "sole responsibility of the department of transportation" mean, particularly when these words are immediately preceded by a section describing the removal of signs by cities generally. "Sole" means sole.

The city has contended that this interpretation leads to absurd results, such as a city being prohibited from removing a dilapidated sign from a highway within the city limits, but the legislature did not say that the signs should not be removed. The legislature simply said that the "sole responsibility" of removing them shall be that of the state, just as the state, or the federal government for that matter, is given sole jurisdiction over other situations occuring within the city limits.

The city has cited the case of E. B. Elliott Advertising Co. v. Metropolitan Dade County, supra, but that case was decided before the adoption of paragraphs 2 and 3 of §479.15 and thus does not apply to this situation. Accordingly, the court finds that the city is prohibited from removing outdoor advertising or advertising structures adjacent to roads or highways on the federal interstate or primary systems. This holding is limited to the *removal* of existing signs or the *prohibition* of future signs. Section 479.15(3) does not appear to prohibit reasonable regulation of such signs, so long as the regulation does not amount to prohibition.

It is further found and held that Chapter 479 does not prohibit the city from regulating, prohibiting or removing all other outdoor advertising or advertising structures.

It is further found and held that Chapter 479 does not require the city to pay compensation in accordance with §479.24(1) when it regulates, prohibits or removes all other outdoor advertisements or advertising structures as in this case.

### (VI)
### IS THE AMORTIZATION SCHEDULE VALID ?

There may be many formulas for determining proper compensation, and amortization schedules are permitted in general. Although "value" may or may not be related to "cost," the evidence established that cost is a proper standard by which to grant compensation. In fact, §479.24 provides that cost ("replacement value") shall be the standard compensation when signs within the purview of that act are removed. The problem here, though, is

that the permit value, while it may be related to cost at the time the permit was taken out, bears no relation to the present cost (or replacement value). The cost of labor and materials of the various signs has changed so dramatically and unevenly over the past years that the present cost cannot be accurately reflected by the original permit value of each particular sign. It is a case of treating unequal objects equally, which is just as unfair as treating equal objects unequally.

It may be, as the city contends, that it could have simply established a flat amortization period; but, it did not do this. What it did do was to establish a schedule; thus, the court must judge its fairness, and the court finds that the schedule is arbitrary and discriminatory, and therefore invalid.

This is not to say a separate evaluation of each sign must be made — signs can be put itno categories as to types or other broad factors so as to permit a practical mode of determining compensation. In establishing an amortization schedule, the guidelines set forth in the cases of Naegle Outdoor Advertising Co. v. Village of Minnetonka, Minn., (1968) 162 NW 2d 206 and Art Neon Co. v. City and County of Denver, Colo., (CCA 10, 1973), 488 F. 2d 120 would be helpful.

I would also point out that if the sign code is a zoning ordinance, the amortization would fail as being inconsistent with rules permitting the continuing use of non-conforming structures.

CONCLUSIONS

In conclusion, the court finds as follows —

1. The meetings of the sign code committee were not in violation of the Sunshine Law.

2. The goal of the city council was aesthetics and not suppression of information and the law affects the physical and general characteristics of the structures and the signs. The effect upon the communications characteristics is secondary and incidental and, therefore, the sign code does not violate the petitioners' right of free speech.

3. The goal of aesthetics is proper with respect to the city of West Palm Beach regardless of the city's designation as "commercial" or otherwise.

Further, the court finds as a matter of fact that West Palm Beach is primarily a commercial, tourist and retirement community, and the latter two aspects are sufficiently ample to justify aesthetics as a proper goal for ordinances of this type even under the strictist interpretation of Miami Beach v. Ocean and Inland Co., supra, and Sunad, Inc. v. City of Sarasota, supra.

4. The ordinance as a whole is reasonably related to the city's goal and is not arbitrary. The effect upon the outdoor industry and the commercial entities is serious but does not amount to a complete prohibition of their business.

5. The following sections of the code amount to a zoning order and are, therefore, invalid — §§3-30, 3-33, 3-35(B), 3-35(C), 3-36 and 3-38. The remaining sections were passed under the general police powers of municipalities and are, therefore, valid, except as may otherwise be determined by this order.

6. The city need not provide compensation under provisions of §479.15(2), Florida Statutes, with regard to those signs which it removes.

7. The city may not, pursuant to §479.15(3), Florida Statutes, remove outdoor advertising or advertising structures adjacent to roads or highways on federal interstate or primary systems, and the code is invalid to the extent that it does this.

8. Chapter 479, Florida Statutes, does not prohibit the city from regulating, prohibiting or removing all other outdoor advertising or advertising structures in the lawful exercise of its powers.

9. The amortization schedule is invalid because it is arbitrary and discriminatory and because it is inconsistent with the rules permitting the continuing use of non-conforming structures under the zoning code.