## MOVIEMATIC INDUSTRIES CORP. v. DADE COUNTY.
No. 75-16716.

Circuit Court, Dade County.

March 29, 1976.

Gáry S. Brooks, Miami, for the petitioner.

Stuart L. Simon, County Attorney, Stanley B. Price, Assistant County Attorney for the respondent.

HAROLD G. FEATHERSTONE, Circuit Judge.

This cause came on to be heard upon the filing of a petition for writ of certiorari directed to the enactment of Zoning Resolution Z-115-75 by the Dade County Board of County Commissioners and the court having examined the pleadings in this cause, briefs of the respective legal counsel, some 27 detailed exhibits filed and having heard oral argument of counsel, makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. The petitioner's property is located approximately one mile west of Krome Avenue at a point due west of North Kendall Drive. The subject property is designated as Government Lots 4, 5, and 6, each of which contains approximately 400 acres.

2. When petitioner purchased the property in late 1964 or early 1965 it was zoned for industrial uses with a special exception for business airport uses. At the time of the zoning hearing, the property was completely undeveloped.

3. On March 19, 1974 the board of county commissioners passed a resolution imposing a building moratorium, known as the East Everglades Moratorium, on an area consisting of approximately 323 square miles of west Dade County. The purpose of this moratorium was to grant a period of time for the preparation of a comprehensive study directed to the protection of the fresh water supply and the natural ecosystems which now function in this part of the county. On the basis of this study, the county decision-makers would be provided with the detailed information required for more scientific and rational decisions concerning future land use policy in this area.

4. The moratorium request was initiated by the Committee for Sane Growth in a letter addressed to County Manager R. Ray Goode. In addition to a discussion of the importance of this area to the water supply of Dade County, the committee made reference to the drought of 1971, the serious inadequacy of South Florida's fresh water needs at present and the major study currently being conducted by the Central and Southern Florida Flood Control District which will serve as the basis for a water allotment program for each of the counties served by the Biscayne Aquifer.

5. The request for the moratorium was forwarded by the county manager to the Dade County Planning Department for its recommendations. The planning deparment concluded that there was substantial evidence to indicate that development under the existing zoning, which was mostly AU and GU, could be detrimental to

the county's ecosystem. Prior to the moratorium, AU and GU zoning permitted development on one-acre lots. After a preliminary study made during the moratorium, AU and GU zoning was changed to require a minimum of five acres before improvement or development would be permitted.

6. Following a detailed review of the moratorium area and the ending of the zoning moratoria in the general area, on April 23, 1975 the directors of the Dade County Building and Zoning Department and Planning Department jointly submitted to the Dade County Commission a request to rezone the subject property from IU-2 (Industry-Heavy) to a GU (Interim) classification consistent with the Dade County Comprehensive Development Master Plan enacted pursuant to Ordinance No. 75-22. The directors also sought a special exception in order to terminate a previously approved special permit issued for business and airport uses.

7. At a duly called public hearing, the Dade County Board of County Commissioners heard detailed testimony from the following individuals called by the administrative staff of the county to support the county's application — (a) F. D. R. Park, Dade County Water Control Engineer; (b) Joseph Schweigart, Florida Flood Control District, West Palm Beach, (c) Tom Buchanan, United States Geological Survey; (d) Dr. Leonard Greenfield, Chairman of the Biology Department, University of Miami; (e) Frank Nix, Hydraulic Engineer for Everglades National Park; (f) Kenneth Schang, Chief Engineer, Dade County Pollution Control Department; and (g) Reginald Walters, Director of the Dade County Planning Department. These professional witnesses gave extremely technical testimony involving complex concepts of hydrology and biology, and their testimony may be summarized as follows —

The subject property area overlies one of the most permeable aquifers in the world, the Biscayne Aquifer. This aquifer serves as the source of virtually all drinking water in Dade County and must be protected from contamination. Due to the unique area hydrology and geology, the Biscayne Aquifer, the inland drainage canals, and the conservation area in west Dade County are all directly interconnected. As a result of this interconnection, the bodies must be considered as component parts of the same water supply system.

The composition of the Biscayne Aquifer is mostly limestone and sand. The generally high porosity of the sand and the many passages through the limestone offer very little resistance to flow. The result is that the aquifer responds quickly to slight differences in the water table, with the following consequences —

1. The water table is relatively flat.
2. The yields of wells are large.

3. The ground and surface water regimens have an uncommonly high interrelationship.

4. The water table reacts quickly to rainfall. There is a high rate of rainfall penetration and surface water infiltration and, although annual rainfall is high, there is relatively little runoff as compared with other localities.

5. The coastal areas, which are exposed to Biscayne Bay and the Atlantic Ocean, are highly susceptible to salt-water intrusion.

The property in question contains a blue-green algae mat or periphyton which filters out many pollutants from the ground water. The process, which is referred to as "bioligical assimilation", is important in protecting the ground and surface water quality.

Before it may be developed or improved, the subject property must be filled by a minimum of three feet of earth or other suitable fill material to comply with federal flood control criteria. Thus, the natural state of the property would have to be substantially altered before any meaningful development thereon could occur.

Any excavation of the petitioner's property would remove the natural periphyton "filtering mat" and would expose the aquifer, from which the drinking water supplies of Dade County are drawn, to a whole range of pollutants. The algae mat involves biological, chemical and physical processes which maintain the area's water quality.

Rainfall, which varies between 40 and 85 inches per year and averages about 59 inches per year, provides the major water resource of Dade County. Approximately 80% of the annual rainfall occurs during the six-month "rainy season" from May through October. The sensitivity of the area is unchallenged.

8. The petitioner did not offer any scientific evidence in rebuttal to the above evidence but did proffer the following documents to the county commission —

(a) Loan authorization agreement;

(b) Appraisal of the property;

(c) Brochure of Krome Industrial, Inc.;

(d) 1973 annual report of petitioner; and

(e) Feasibility study.

The petitioner, through its attorney, further stated that the property would be rendered valueless by the proposed rezoning of the property and that there are no viable uses for its property.

9. The director of the Dade County Building and Zoning Department made the following recommendation to the county commission —

Application should be approved; the request being in accordance with the East Everglades Moratorium Area Study.

The purpose of this rezoning is to eliminate the industrial zoning in this remote area, there being no justification for the multitude of uses which would be permitted in a liberal industrial zoned area, so far removed from necessary governmental facilities and services.

10. The Dade County Planning Department's formal recommendation read as follows —

*Approval.* This rural part of Dade County has not established any urban land use trend and it is not expected to even in the year 2,000. The only activity in the area is a cement plant which is located here only because of the excavation resources, a military installation, a few scattered homes and some agricultural uses. The subject property is vacant, and in conflict with the Comprehensive Development Master Plan which shows this area as preservation.

\* \* \*

The existing zoning was granted in 1958 before any overall planning for Dade County, and has no logical relationship of development to a desirable and efficient overall urban pattern for our community. This existing industrial zoning would be detrimental to the health and safety of our community and unduly burden certain utilities.

11. Based upon the foregoing, by a unanimous vote of the commission, Resolution No. Z-115-75 was adopted which rezoned the subject property from IU-2 to GU and terminated the special permit issued in 1958. From said zoning resolution, the petitioner filed its petition for writ of certiorari.

### ISSUE PRESENTED

The court is of the opinion that the facts of this cause, while highly complex and novel to the state of Florida, can be addressed by the following statement of the issue —

*Did the adoption of Dade County Zoning Resolution Z-115-75 by the Dade County Board of County Commissioners constitute (1) a valid exercise of the police power, (2) Zoning which may be classified as "Fairly Debatable", and (3) A "Taking of Real Property" under the Florida Constitution?*

## CONCLUSIONS OF LAW

The constitutional validity of a zoning resolution or ordinance depends upon its relationship to the public health, safety, morals and welfare. If the zoning resolution has a substantial relationship to any one of these objectives, it may be constitutionally valid, that is, within the police power of the legislative body. See *City of Miami Beach v. Weiss*, Fla. 1969, 217 So.2d 836; *City of Miami v. Rosen*, 1942, 151 Fla. 677, 10 So.2d 307; *City of Miami Beach v. 8701 Collins Ave.*, Fla. 1954, 77 So.2d 428.

Zoning resolutions or ordinances are not different from other municipal ordinances or resolutions and are presumed valid and should not be interfered with by the courts, unless they are arbitrarily and unreasonably applied to a particular piece of property. See *Smith v. City of Miami Beach*, 3rd Fla. App. 1968, 213 So.2d 281. In so determining, courts will not ordinarily substitute their judgments for those of the legislative body of a county. The time-honored test established by the United States Supreme Court and applied in Florida is whether a particular ordinance or resolution as applied to a particular piece of property, is "fairly debatable". That is, if the contention that a zoning ordinance serves the health, safety, morals or general welfare of the public can be supported by grounds that are fairly debatable, then the court should not substitute its judgment for that of the zoning authority. See *Smith v. City of Miami Beach*, supra; *City of Miami Beach v. Wiesen*, Fla. 1956, 86 So.2d 442; *City of Miami Beach v. Lachman*, Fla. 1953, 71 So.2d 148; *Davis v. Situs, Inc.* Fla. App. 1973, 275 So.2d 600.

The burden of parties seeking relief from a zoning resolution as to a particular piece of property is an extraordinary one and is upon the petitioner (property owner) to show that the application for rezoning raised a matter which was not even fairly debatable before the legislative authority. See *City of St. Petersburg v. Aikin*, Fla. 1968, 217 So.2d 315; *Smith v. The City of Miami Beach*, supra; *Metropolitan Dade County v. Kanter*, Fla. App. 1967, 200 So.2d 624. In determining whether the resolution is fairly debatable, it does not matter that there was competent evidence against the resolution, and that such evidence might well have sustained the position of the county had it enacted a resolution to permit the requested use of the property. What is important is that there be substantial competent evidence to support the decision of the county commission and to show that the matter in issue is at least fairly debatable. See *Bessemer Properties, Inc. v. Miami Shores Village*, 3rd Fla. App. 1959, 110 So.2d 87; *Dade County v. Epstein*, 3rd Fla. App. 1965, 181 So.2d 556.

The Florida courts have held that if the fairly debatable rule is a sound one, there is no situation in the field of zoning in which

it is more applicable than that involving the decision of where the dividing line between use districts should be placed. In *City of Miami Beach v. Wiesen,* supra, the Florida Supreme Court commented on a dividing line between use districts at 86 So.2d, page 445 —

> . . . It is trite to observe that in zoning a city into various use districts there must be a dividing line somewhere. The selection of such a line involves the exercise of the legislative power and is a problem peculiarly within the power of the ligislative body of a municipality. It involves a high degree of legislative discretion and an acute knowledge of existing conditions and circumstances. *If the fairly debatable rule is a sound one, and we have so held, there is no situation in the field of zoning in which it is more applicable than that involving the decision of where the dividing line between use districts should be placed. Recognizing the fundamental premise that there must be a line somewhere, the courts should be highly respectful of the decision of the legislative body which, under the law, is vested with the power and charged with the duty of zoning.* The courts should tread lightly in this field and then only where the actions of the city council are so unreasonable and unjustified as to amount to confiscation of property. (emphasis added)

In applying the fairly debatable rule, the Florida courts have held that a zoning resolution is not invalid merely because it prevents the owner from using the property in a manner which may be economically most advantageous. If economic advantage were the rule, no zoning would ever stand. See *City of Miami v. Zorovich,* 3rd Fla. App. 1967, 195 So.2d 31, cert. den., Fla. 1967, 201 So.2d 554; *Metropolitan Dade County v. Greenlee,* 3rd Fla. 1969, 224 So.2d 781. It is not necessary to the constitutional validity of the zoning resolution or ordinance that it permit the highest and best economic use of a particular piece of property. See *County of Brevard v. Woodham,* 4th Fla. App. 1969, 223 So.2d 344. As noted by the Florida Supreme Court in *City of St. Petersburg v. Aikin,* supra, the mere fact that a landowner is proposing to make both a reasonable use of his property and one consistent with the public welfare does not per se permit the conclusion that the zoning which precludes a proposed use is constitutionally defective. Zoning must be based on public rather than private use. It must be in the best interests of the communiy as a whole. See *City of Tampa v. Consolidated Box Company,* 2nd Fla. App. 1959, 110 So.2d 446.

It is important also to note that the board of county commissioners acted pursuant to the recommendations of its professional staff. Both the building and zoning department as well as the planning director recommended approval of the rezoning application. These recommendations were part of the record before the commission

and are a strong indication that the commission's reasons for its action are more than merely "fairly debatable". See *Hall v. Korth,* 3rd Fla. App. 1971, 244 So. 2d 766; *Miles v. Dade County,* 3rd Fla. App. 1972, 260 So.2d 553; *Metropolitan Dade County v. Fletcher,* 3rd Fla. App. 1975, 311 So.2d 738.

Applying these principles to the case *sub judice,* it is clear that the petitioner failed to demonstrate that the commission's action was not "fairly debatable".

What is involved in this case is one of the most basic questions of federal constitutional law and that is the balance between public and private rights under the Fifth and Fourteenth Amendments to the United States Constituion. This issue, often referred to as "the taking issue", has demanded federal attention from the very foundation of this nation. See *Withers v. Buckley,* 61 U. S. 20 (1857); *Pumpelly v. Green Bay Co.,* 80 U. S. 166 (1871); *Bedford v. U. S.* 192 U. S. 217 (1904); *Transportation Co. v. Chicago,* 99 U. S. 635 (1878); *Bridge Co., v. U.S.,* 105 U. S. 70 (1881); *Mugler v. Kansas,* 123 U. S. 623, 8 S.Ct. 273 (1887); *Sweet v. Rechel,* 159 U. S. 380 (1895); *Pennsylvania Coal Co. v. Mahon* 260 U. S. 393 (1922); *Goldblatt v. Town of Hempstead,* 369 U.S. 590 (1962); and most recently in *Village of Belle Terre v. Borass,* 416 U. S. 1, 39 L.Ed. 797, 94 S.Ct. 1536 (1974).

The threshhold question in any action for inverse condemnation is whether the constitutional provision that provides the basis for the property owner's claim requires compensation if the property is merely limited in its possible uses rather than actually "taken". The state of Florida follows the dictates of the Federal Constitution, Fifth Amendment, which provides only for private property "taken for public use, without just compensation".

Art. X, §6(2) of the Florida Constitution, provides that —

"No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner."

The keys to this governmental power of eminent domain are the requirements that private property may be taken by government only for a public purpose or use, and only if full compensation is paid. Through eminent domain, physical possession and use of property are taken from a private owner and transferred to the public. The private party is then compensated for the property loss. Private property may also be subordinated to the public interest without resort to eminent domain through the exercise of the police

power. If this were not so, then virtually no zoning would be lawful. Like eminent domain, action taken pursuant to the police power must benefit the public by serving a public purpose; however, as distinguished from eminent domain, a valid exercise of the police power may restrict the use of private property without requiring compensation. A valid exercise of the police power does not necessarily constitute a taking of property requiring compensation. It is not a crime for government to govern. This difference between a taking and limiting the use through zoning was recently noted by the Fourth District Court of Appeal in *Mailman Development Corp. v. City of Hollywood*, 4 Fla. App. 1974, 286 So.2d 614, cert. den., 293 So.2d 884, cert.den., 419 U. S. 844, at page 615 —

> . . . there is a clear distinction between the appropriation of private property for public use in the exercise of the power of eminent domain, and the regulation of the use of property under the police power exercised to promote the health, morals and safety of the community . . . *We hold that enactment of a zoning ordinance under the exercise of police power does not entitle the property owner to seek compensation for the taking of the property through inverse condemnation.* (emphasis added)

The petitioner's contention that its property has been rendered valueless must fail since there was no competent or substantial evidence submitted to show that the property, now subject to the moratorium imposed, was valueless. The law of this state is that an opinion of value may only be rendered by a real estate appraiser and/or property owner. The opinion of an attorney is insufficient.

Due to its restrictive nature, the exercise of police power over the use of property must necessarily clash with the full enjoyment of that property by an owner. *Town of Bay Harbor Islands v. Schlapik*, Fla. 1952, 57 So.2d 855. Yet, it is established in Florida that all property rights are held and enjoyed subject to the reasonable exercise of the police power in futherance of the general welfare. *Dutton Phosphate Co. v. Priest*, Fla. 1914, 65 So.2d 282; *City of Miami Beach v. Ocean and Inland Co.*, Fla.1941, 3 So.2d 364. Relative to land use regulations, the Supreme Court declared in *City of Miami Beach v. Ocean and Inland Co.*, supra, at page 366 —

> It is fundamental that one may not be deprived of his property without due process of law, but it is also well established that he may be restricted in the use of it when that is necessary to the common good. So in this case we must weigh against the public weal plaintiff's rights to enjoy unhampered property acquired since the enactment of the ordinance. Such restrictions must find their basis in the safety, health, morals or general welfare of the community.

In the instant case, the record is replete with testimony that the best interests of the total community would be sacrificed unless there was a reasonable exercise of the police power by the Dade County Commission.

The judicial burden gleaned from the case law cited in the respective legal briefs of counsel are —

(1) The court must objectively assess the burdens that will be imposed upon the community by the unrestricted use of the petitioner's private property; and

(2) The court must determine whether there has been a total taking of property or whether only a reasonable restriction on the use of the property has been imposed; and

(3) The court must determine whether the property owner has the right to alter the natural state of his land at the expense of the general public good.

The record in this cause is replete with expert evidence that the unrestricted use and development of the petitioner's property would have grievous ecological effects upon the general population of Dade County. The petitioner has not offered one scintilla of scientific testimony to rebut this evidence. The courts of this state have traditionally upheld the valid exercise of the police power in limiting the use of one's property to the public detriment. The Supreme Court of Florida in *Sarasota County v. Barg*, Fla. 1974 302 So.2d 737, in upholding the constitutionality of a state special act which limited the density, use and number of structures placed upon an environmentally sensitive area, stated at page 741 —

> The appellees asserted that Section 4 of the Act, by limiting the uses to which they may put their lands and the structures they may construct thereon, deprives them of their property without due process of law. We find this assertion to be without merit. Section 4 of the Act does not deprive appellees of their property, or of the use of their property; it simply regulates the use of that property. *Reasonable restrictions upon the use of property in the interest of the public health, welfare, morals, and safety are valid exercises of the State's police power.* E.g., City of Miami Beach v. Ocean & Inland Company, 147 Fla. 480, 3 So.2d 364 (1941). The restrictions imposed by Section 4 of the Act are reasonable, in light of the legislative intent — expressed in Section 1 of the Act — to preserve the natural beauty of Manasota Key. (emphasis added)

This court considered the petitioner's claim that all possible economic uses of its property have been precluded. The record presented to this court does not reflect that situation. Pursuant to the Dade County Code of Ordinances, §33-196, the petitioner is

entitled to utilize its property in the following fashion — "if no trend of development has been established in the neighborhood, minimum standards of the EU-2 district shall be complied with". The classification of EU-2 permits development of one family residential use to a minimum lot size of five acres. It is clear from the record presented to this court that the petitioner as a matter of right may devote its property to a single family five-acre estate district (see—§33-234 of the Code of Metropolitan Dade County). In addition, EU-2 district permits all uses in an EU-1 zone (see §33-226 (1) through (7) thereof, Code of Metropolitan Dade County). Further, both the Dade County Comprehensive Development Master Plan, Part II, and the recommendations of the Dade County Planning Department suggest possible alternative uses of the property, to-wit, lake excavation, rock crushing, block plants, agriculture park and active recreational use. While it is true that the testimony offered to the county commission indicated that several of the uses may not be practical at this time the court does not wish to speculate as to what the county commission might do at some future time pursuant to an appropriate zoning application for use by the petitioner. The court believes that any consideration of this issue would be premature at this time.

The court further rules that the petitioner herein has failed to exhaust its administrative remedies in regard to possible uses to be employed on the subject property. Pursuant to §33-197, Code of Metropolitan Dade County, the petitioner may submit for recordation a subdivision plan in accord with an EU-2 district. The section further reads — "where application for building permits indicates the need for reclassification of an area in a GU district, the director may initiate an application for change of zoning". The record in this cause is clear and unequivocal that the petitioner in this cause has not opted to utilize its property pursuant to §33-197, Code of Metropolitan Dade County. The doctrine of failure to exhaust administrative remedies has been a fundamental part of the laws of the state of Florida for many years. See 1 Fla. Jur., *Administrative Law*, §175; *Pushkin v. Lombard*, 279 So.2d 79 (3rd D.C.A. 1973); *City of Coral Gables v. Sakolsky*, 215 So.2d 329, 334-5 (3rd D C A Fla. 1968); *Decarlo v. West Miami*, 49 So.2d 596 (Fla. S. Ct. 1950).

It is the goal of every man and woman to live in harmony with his neighbors and the environment. The court believes that Dade County is and can continue to be such a place. The court's legal conclusions are best expressed by the following from *Nattin Realty, Inc. v. Ludewig*, S.Ct.1971, 324 N. Y.S. 2d 688 —

> The court is not unmindful that zoning changes prompted by such environmental considerations may appreciably limit the uses and profitability of land; yet if both factors were to be placed upon the scales, the

*pro bono publico* considerations must prevail. *If there is substantial evidence sustaining the municipality's determination to rezone because of ecology, the court should not void such legislative determination.*

Some uncompensated hardships must be borne by individuals as the price of living in a modern, enlightened and progressive community.

It is therefore ordered and adjudged that — (1) The petition for writ of certiorari is denied. (2) Dade County Zoning Resolution Z-115-75 is upheld as valid and constitutional. (3) Each party shall bear its own costs.